**Dennis G. MOORE and George R. Moore, Plaintiffs-Appellees, Cross-Appellants,**

v.

**BOATING INDUSTRY ASSOCIATIONS, Trailer Manufacturers Association and Donald I. Reed, Defendants-Appellants, Cross-Appellees.**

**Nos. 83–2148, 83–2201.**

United States Court of Appeals, Seventh Circuit.

Argued May 23, 1984.

Decided April 29, 1987.

Stanley M. Lipnick, Arnstein, Gluck & Lehr, Chicago, Ill., for defendant-appellant/cross-appellee.

August E. Roehrig, Jr., Fitzgibbon, Roehrig, Greenawalt & Stone, Chicago, Ill., for plaintiff-appellee/cross-appellant.

Before CUMMINGS, Circuit Judge, COFFEY, Circuit Judge, and WYATT, Senior District Judge.[*]

WYATT, Senior District Judge.

In this civil action we affirmed a judgment for plaintiffs, 754 F.2d 698 (1985; hereafter sometimes referred to as *Moore I*), based on a finding for plaintiffs by a jury on a special verdict form on "the issue of violation of section one of the Sherman Antitrust Act." The defendants were two affiliated trade associations representing companies in the boat and boat trailer business and an executive of the associations. Thereafter, the Supreme Court, on petition of defendants, granted certiorari, vacated our judgment, and remanded for our further consideration, 106 S.Ct. 218 (October 15, 1985), in light of the unanimous Supreme Court decision (made some months after our decision) in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985; hereafter often *"Northwest"*).

We based our decision in *Moore I* in large part on what now seems after re-examination to have been a mistaken view of the industry self-regulation in the case at bar: that the activity of which plaintiffs here complain was part of "an industry's attempt at self regulation," 754 F.2d at 707, an instance where "adopted industry standards are applied in a discriminatory manner," *id.* at 708, a "program in an attempt to regulate themselves," *id.* at 711, part of "attempts to regulate its members' conduct by imposing industry wide standards," *id.* at 713, and "an attempt to regulate themselves and their industry," *id.* at 714. We believe that these findings are not supported in the record here before us. The defendants were *not* imposing *their own* standards nor in any way exercising self-regulation but were, as we elsewhere noted in *Moore I*, making "a commendable effort ... to promote compliance with the federal standards," *id.* at 708, part of a highway safety act enacted by Congress and an entirely *objective*, legally controlling, standard. Without, at that time, the guidance of *Northwest* from the Supreme Court, we had found *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) "the controlling precedent." Without any evidence of anticompetitive purpose or intent, we affirmed the judgment for an antitrust violation, citing *Silver* (among other cases) as explained at one point in our opinion: "Once it is established that an association wields market power in setting or enforcing industry standards, it is the *arbitrary* application of those standards ... or *the lack of minimal due process* ... that gives rise to antitrust liability," 754 F.2d at 713; emphasis supplied. We were mistaken in this because the "standards" were *not* "industry standards" but were standards set by federal legislation and enforced by Congress and by the federal executive branch. We were mistaken also because we failed to appreciate, as the Supreme Court later made clear in *Northwest*, that "the absence of procedural safeguards can in no sense

determine the antitrust analysis," 472 U.S. at 293, 105 S.Ct. at 2619.

The antitrust claim, according to the record, was tried by plaintiffs and by the trial court on the *Silver* theory: that there could be a violation of the antitrust law without any finding of an anticompetitive purpose or effect on the part of defendants if there was arbitrary and unreasonable conduct by them toward the Moores in the course of a *self-regulation* program. The trial judge instructed the jury that there should be a finding for plaintiffs on their antitrust claim if defendants "acted for an anticompetitive purpose *OR* in an unreasonable and arbitrary manner" (emphasis supplied). In plainest words, this told the jury that if defendants were "unreasonable and arbitrary" in their conduct, there should be a verdict for plaintiffs, without the necessity of a rule of reason analysis to determine whether there had been any anticompetitive purpose by defendants or not. That this was error is now clear from the *Northwest* opinion of the Supreme Court, which undermines our reasoning in *Moore I.*

The *Northwest* opinion declares that the "correct path of analysis" requires recognition "that not all concerted refusals to deal should be accorded *per se* treatment" (472 U.S. at 297, 105 S.Ct. at 2621). As to the claimed group boycott in the case at bar, the trial judge found (memorandum opinion filed May 25, 1983, p. 7): "There was no evidence that this concerted activity [the claimed group boycott] had as its purpose anything other than the promotion of compliance with the federal requirements" and had "laudatory purposes." Thus the conduct of which the Moores complained did not, under the principles of the *Northwest* opinion, fall into "a category likely to have predominantly anticompetitive effects" and which would authorize "application of the *per se* rule" (472 U.S. at 298, 105 S.Ct. at 262). On the contrary, it appears that the conduct here challenged, again under the principles of *Northwest,* "does not necessarily imply anticompetitive animus and thereby raise a probability of anticompetitive effect" (472 U.S. at 296, 105 S.Ct. at 2620). In such a situation, the *Northwest*

opinion teaches that whether a claimed group boycott is an antitrust violation must be determined after the question of "anticompetitive animus" has been "appropriately evaluated under the rule of reason analysis," (472 U.S. at 296 n. 7, 105 S.Ct. at 2620 n. 7).

On our reconsideration after vacatur by the Supreme Court of our earlier judgment, we are unable to find evidence sufficient to support a finding that there was any group boycott here, nor that there was any competition between plaintiffs and the members (boat trailer manufacturers) of defendant associations, nor that defendants had any anticompetitive purpose in what they did, nor that the jury was properly instructed (as required by *Northwest*) that such an anticompetitive purpose was an essential element of the antitrust claim and required to find such purpose on a rule of reason analysis before returning a verdict for plaintiffs. By the decision in *Northwest,* we are obliged therefore to reverse the judgment for plaintiffs on their antitrust claim and to direct judgment on that claim for defendants; on the cross-appeal in No. 83–2201 by plaintiffs, which we did not address in *Moore I,* 754 F.2d at 719 n. 33, we affirm the orders of the trial judge granting the motion of defendants under Fed.R.Civ.P. 50(b) for judgment notwithstanding the verdict as to the common law disparagement claim and refusing to enter judgment for plaintiffs on the jury's advisory verdict on the statutory disparagement claim.

1.

The antitrust claim concerns primarily motor vehicle safety on the highways, to which for some twenty years Congress and the federal executive branch have given much attention. More specifically the case arose from good faith efforts by a trade association to encourage and assist its members (and only boat *trailer* manufacturers could be "members" (T378–79; "T" references are to pages of the stenographic transcript)) to comply with federal motor vehicle safety laws. Such good faith efforts provoked this civil action by a manu-

facturer of boat trailer *lamps* sold principally to boat trailer manufacturers, some of which were members of the relevant trade association.

The National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. §§ 1381 and following ("the Safety Act"), declared the purpose of Congress "to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents." The Safety Act itself specifically provides for the "[s]upremacy of federal standards" and denies any authority to the states "to establish ... with respect to any motor vehicle or *item of motor vehicle equipment* any safety standard applicable to the same aspect of performance of such vehicle or *item of equipment* which is not *identical* to the Federal standard," 15 U.S.C. § 1392(d) (emphasis supplied). Thus, for purposes of national highway safety standards, *federal* regulation is dominant and the states play a relatively minor part. Surprisingly, the parties have devoted much, if not most, of their efforts to approvals, tests, and proceedings by the California Highway Patrol (CHP)—matters which would seem to have little bearing on our decision, which should be governed solely by *federal* safety laws.

The products involved in this action are boat trailers and boat trailer lamps. (The parties and their counsel generally use the word "lights" instead of "lamps" but the federal regulations use the word "lamps" and the two words will hereafter be used interchangeably).

■ Boat trailers are vehicles designed to cradle and carry a small pleasure boat when pulled by a passenger automobile or other mechanically powered tow. They are extensively used for moving pleasure boats from inland locations to bodies of water, such as sea shores, lakes, and rivers, for temporary use and for returning them to their normal inland storage places. They and their tows move over streets, roads and highways; because of their combined length and the size and shape of the boat being moved, it is evident that serious highway safety problems and risk of death or injury are presented. A boat trailer is a "motor vehicle" made subject to the Safety Act, 15 U.S.C. § 1391(3); manufacturers of boat trailers must therefore comply with federal motor vehicle safety standards.

■ Boat trailer lamps are used for warning and signaling purposes and plainly are essential to safety, especially at night. Boat trailer lamps are subject to the federal motor vehicle safety standards, which by the Safety Act itself apply to "motor vehicle equipment," 15 U.S.C. § 1391(2); the regulations contain a separate "Standard No. 108" applicable to "lamps, reflective devices, and associated equipment," 49 CFR § 571.108. These standards are said therein to be "necessary for signaling and for the safe operation of motor vehicles during darkness and other conditions of reduced visibility." Manufacturers of boat trailer *lamps* must therefore comply with federal trailer lamp ("motor vehicle equipment") standards.

The Safety Act gives broad enforcement authority to the Secretary of Transportation (the "Secretary"; 15 U.S.C. § 1401). Under regulations duly issued, the Secretary exercises his authority thru a National Highway Traffic Safety Administration, the head of which is the Administrator, 49 CFR § 501.1–.8. For simplicity, the Secretary, the Administration, and the Administrator will sometimes be referred to collectively as the "Secretary."

The Safety Act does not make it a condition for a lawful sale of motor vehicles (boat trailers) or their equipment (trailer lamps) that a certificate be obtained in advance from the Secretary that the trailer or lamp complies with federal safety standards. On the contrary, the Safety Act and regulations require (a) that a manufacturer or distributor of a trailer lamp furnish at the time of sale a certificate that the lamp "conforms to all applicable federal ... safety standards" and (b) that a manufacturer or distributor of boat trailers furnish at the time of sale a certification that the trailer (including its lamp) "conforms to all applicable federal ... safety standards." 15 U.S.C. § 1403. The scheme of the Safety Act, and the regulations, thus rely on *self-certification* of

compliance by the manufacturer and *not* on any advance certification or approval by the Secretary. Indeed, it is undisputed that the Secretary does *not* in advance of sale approve, or certify as in compliance with federal safety laws, any boat trailer or lamp. The Federal safety regulations do provide, however, that in specified instances any "lamp" or other "item of associated equipment" may be "labeled with the symbol DOT" and that this "shall constitute a certification that it conforms to applicable Federal motor vehicle safety regulations." 49 CFR § 571.108 S4.7.2.

The plaintiffs understood at all relevant times that their lamps had to meet *federal* safety standards and that the Secretary did not determine compliance in advance of sale but on the contrary relied on self-certification by the lamp maker and the deterrent effect of the fine and recall provisions of the Safety Act. Counsel for plaintiffs told the jury at trial: "[I]n 1968 the Federal government set up certain lighting requirements that trailers had to meet. This program ... is administered by the Department of Transportation throughout the nation. As the program is administered, there is a standard which trailer lighting must meet. That is referred to as Federal safety ... standard 108 ..." (T13). And also: "The Department of Transportation ... had what is referred to as a self-certification program. In other words, if you designed a light, you do whatever tests you feel are sufficient to convince you that you meet those standards. When you do, you mark it on the face of your lens. That is a self-certification program" (T14). Dennis Moore testifying at trial admitted that "the federal government doesn't issue any certificate of approval or anything like that" but "You are self-certified" (T274) and that he put the symbol "DOT" on his "product" (T274). He was then asked: "So it is basically a self-policing type thing, isn't it?" and answered: "That's right ... But it's up to you to use your integrity as a manufacturer to see that the products are meeting their [federal] laws" (T275).

The Safety Act prohibits the sale of any motor vehicle (including a boat trailer) unless it and its lamps and other equipment conform to Federal safety standards. 15 U.S.C. § 1397(a)(1). The prohibition is not applicable to a person who can establish that "he did not have reason to know in the exercise of due care" that the trailer or lamp did not comply with "federal" safety standards. 15 U.S.C. § 1397(b)(2). There are also severe civil penalties for any trailer manufacturer who sells trailers whose lamps do not conform to federal safety standards or which violate the Safety Act in any other way. 15 U.S.C. § 1398. The penalty is a fine of up to $1,000 "for each such violation" up to a maximum of $800,-000 "for any related series of violations." There is a separate violation "with respect to each [trailer] or [lamp]." 15 U.S.C. § 1398(a). Such a penalty appears to be enforced by a civil action brought by the Secretary in the name of the United States. In addition, where a trailer manufacturer sells to dealers boat trailers which do not conform to federal safety standards, all such vehicles must be repurchased by the trailer manufacturer, with interest and transportation charges. 15 U.S.C. § 1400. It can be seen that, by reason of the civil penalties described (often referred to by the parties as fines and recalls), sales of a boat trailer which did not conform to federal safety standards by reason of nonconforming lamps could be ruinously expensive to the trailer manufacturer.

### 2.

The plaintiffs in this action are Dennis and George Moore, son and father, who at all relevant times made in California and sold nationally boat trailer lamps under the name "Dry Launch," often referred to hereafter as the "Moore lights." The plaintiffs will usually be referred to as "the Moores" and as Dennis or George individually.

The Moores began to market their lamp in the early 1970's. They have repeatedly claimed in this action that it was a "unique product" (for example, T9) because, as Dennis testified (T48), it applied an airtrapping principle to permit the lamp on a boat trailer to be submersible. It appears that the Moores contended that their lamps

were unique in order to explain their claim that Wesbar—a lamp competitor—attempted to harm the Moores through the two defendant trade associations and to argue that the defendant trade associations discriminated against the Moores in order to overcome the competitive advantage of the "unique" lamp sold by them. It seems established, however, that there is nothing unique about the Moore lamps. The point should be emphasized, nonetheless, because it involves a controversy and a separate litigation between the Moores, as plaintiffs, and Wesbar Corp. and Weber, president of Wesbar, as competitors in the trailer lamp business and who figure in the case at bar.

The separate litigation with Wesbar and Weber was decided by this Court in *Moore et al. v. Wesbar et al.*, 701 F.2d 1247 (1983), the opinion which found that the Moore lamps are not "unique." When Moore began to make "a submersible boat trailer light" he applied for a patent on the device, but his claims were covered by the prior Bloodgood patent (issued in 1963) which made use of the ancient airtrapping principle. The Moore "patent application was rejected on the basis of the Bloodgood patent" but Moore later obtained a patent on a different device by which a lamp bulb was mounted in a lamp housing. Moore bought the Bloodgood patent in November 1973 for $2,500. Moore sued Wesbar and Weber in the District Court for the Eastern District of Wisconsin for (a) product disparagement and (b) infringement of the Bloodgood patent. After a lengthy jury trial, the jury found that Wesbar had infringed the Bloodgood patent and had disparaged the Moore lamps but that the Moores had not been damaged by the disparagement. The trial court let stand the finding of infringement but entered judgment for Wesbar and Weber on the ground that the Bloodgood patent was invalid for obviousness. The trial court entered judgment for Wesbar and Weber on the product disparagement claim because it was found that the Moores had not been damaged.

The Moores then appealed to this Court from the judgment of invalidity of the Bloodgood patent; Wesbar and Weber appealed to this Court from the finding of infringement. After deciding that the patent owned by the Moores was based on the obvious in that "the airtrapping principle has been recognized since the days of Aristotle," 701 F.2d at 1252, this Court upheld Wesbar and Weber, affirming the judgment of patent invalidity and reversing the finding of infringement.

Attention is directed to the Wesbar litigation because it is significant that there had been hostility between the Moores and Wesbar (their competitor) before any activity by defendants led to this suit by the Moores, and because it is significant that there is nothing unique about the Moore trailer lamps.

3.

The defendants-appellants are two trade associations and Reed, an executive of the associations. One of the defendant associations is Boating Industry Associations (BIA), apparently made up of four other trade associations whose members are engaged in various aspects of the marine industry (T378). The technical structure of these four associations at any given time is not clearly shown by the evidence and is not here material. The other association named as a defendant is Trailer Manufacturers Association (TMA). Reference herein, for simplicity, will usually be to TMA, as the more involved of the two associations. The Moores, as *lamp* manufacturers, do not compete with the members of Trailer Manufacturers Association, the association which had the compliance program, at whose annual meeting in 1976 an alleged disparaging remark was made by Reed, and which is charged with the other acts claimed to be antitrust violations. There is no evidence in the record of any competition between the Moores as lamp makers and the members of TMA; there is evidence that *one* lamp maker competitor of the Moores, Wesbar, was a nonvoting *associate* member of TMA (only trailer manufacturers could be "members" of TMA, with voting rights.) The plaintiffs had the burden to show by evidence competition between them and the members of

TMA. They did not do so. Except as to Wesbar, there was no evidence on the point. There was an argument in the brief for the Moores on their cross-appeal (p.42) that the "boat trailer light manufacturing members" of "the Association" were "direct competitors" of the Moores. The argument was not supported, however, by evidence of any such competition, except as to one non-voting associate member of TMA, Wesbar, and not even the *extent* of this competition was shown.

The members of TMA were boat *trailer* manufacturers only (T378–79); the name itself "Trailer Manufacturers Association," plainly shows this and it is not disputed. Counsel for the Moores at the opening of the trial referred to "the Trailer Manufacturers Association which manufactures *boat trailers*" (T10; emphasis supplied). There was a "different class of membership," associate membership, for those who "made hardware items such as lights" and did not make boat trailers (T379). Associate members could come to TMA meetings but *did not have any "voting rights"* (T379; emphasis supplied). As noted above, the only lamp manufacturer shown by evidence to have been an associate member of TMA was Wesbar (T199–200). It is undisputed that the Moores were not associate members of TMA, but no evidence on the subject was found, one way or the other. It is not contended nor suggested that the Moores were ever denied associate membership, or ever wished such status, or would have had any difficulty whatever in becoming associate members.

Manufacturers of boat trailers, some of which are members of TMA, are *customers* for trailer lamps. The trailer manufacturers do not make lamps. There is no competition between lamp and trailer manufacturers. The latter are the customers of the former.

There is no evidence of any group boycott by the trailer manufacturer members of TMA, nor any suggestion of any motive by the trailer manufacturers for such a boycott. It would seem to make no difference to a trailer manufacturer from whom he bought lamps, so long as they complied with federal safety standards and thus did not expose the trailer manufacturer to federal penalties of fines and recalls.

■ There is evidence that TMA at one point advised its trailer manufacturer members that questions had been raised whether the lamps of the Moores and of two other lamp makers were in compliance with federal safety laws. So long as these questions had not been answered, TMA could not certify that the questioned lamps, and trailers using them, complied with federal safety law. There being no evidence whatever of any agreement not to buy lamps uncertified by TMA, there was nothing whatever in the evidence to support a finding of a group boycott of the Moores.

■ There could not have been any horizontal group boycott because the Moores and the trailer manufacturers do not market in the same horizontal plane. The Moores sell lamps to the trailer manufacturers; the latter buy lamps from the Moores and use them on their trailers sold as such to boat dealers and to boat owners.

The jury did not in any event find any "anticompetitive" group boycott of the Moores because the jury was instructed to find for plaintiffs on the antitrust claim if they found that defendants "acted ... in an unreasonable or arbitrary manner," whether or not they had an "anticompetitive purpose."

### 4.

The controversy between the parties here appears to have become public on Wednesday, September 29, 1976, at the annual meeting of TMA in Chicago, held by custom the day before the opening of the annual Boat Show there. By the time of that annual meeting, there had been a good deal of discussion in trade circles whether the Moore lamps were in compliance with federal safety standards, and compliance of lamps made by others had also been questioned. It was not surprising, therefore, that when Reed, as a member of the TMA staff, was reporting on federal safety standards, he mentioned that several lights "were involved," that "these things were

under investigation," and that "in due course everybody would be notified" (T580). Questions then came from the floor for the names of "these light manufacturers." Reed declined to give names until the investigations were concluded. The questioning "persisted" and one person asked if one of them was the Moores. Reed declined to answer but was instructed to do so by the Chairman, a trailer manufacturer and a customer of the Moores. Reed then said that one of them was the Moores and "at the same time" pointed out "Acutek and Tite-Lite" as two others; Reed testified that this was "substantially all that was said" (T581).

After the September 29, 1976, annual meeting of TMA, a trailer manufacturer (according to his testimony) told Dennis that Reed had there stated that the Moore lamp "was not DOT approved" (T101). Dennis apparently treated this as the equivalent (which it is not) of a statement that the Moore lamp did not comply with federal safety standards. The Moores' lawyer was "within a day or two" brought in to direct countermeasures (T294).

Because the Boat Show was then in progress and the Moores were, with their lawyer, apparently planning a lawsuit against Wesbar, there was no effective effort by the Moores to show defendants that their lamp did in fact comply with federal safety standards.

After the September 29, 1976, TMA annual meeting and the appearance of the Moore lawyer, the defendants—as a matter of fairness and prudence—engaged an independent testing laboratory, Ann Arbor Testing Laboratories, to determine whether a Moore lamp obtained in the open market by defendants, was in compliance with federal safety standards (T582–83). The report of Ann Arbor is dated November 24, 1976 (DX208) and concludes that, when tested, the "functions" of the Moore lamp "failed to meet minimum and maximum luminosity intensity requirements of FMVSS 108 [Federal Motor Vehicle Safety Standards 108]...."

Moreover, at some time between January 11, 1977, and January 17, 1977, Reed re-ceived from CHP three separate test reports of Moore lamps "Dry Launch 701" (DX209), "Dry Launch 701 w/white hsg. [housing]" (DX210), and "Dry Launch 701L" (DX213). Each of these reports is dated January 11, 1977, each is signed "M. Wilson," and each concludes "Does not comply [with federal safety standard 108]."

After receiving these independent test reports, Reed wrote the Moores under date of January 17, 1977, as follows (PX14):

We have received information that your old 701 series lamps have failed the SAE photometric requirements referenced in Federal Standard No. 108 conducted by ETL and the State of California, and that the current style 701 series lamps failed in tests conducted by ETL, Ann Arbor Testing Laboratories and the State of California. Except for the California tests which we are informed you have received directly, copies of the test reports are enclosed.

As a result we must notify the TMA Certified Trailer Manufacturers that your 701 series lamps do not meet the requirements of the TMA Certification Program and may not be used on TMA Certified vehicles. If you are desirous of or intend to correct the problems described in the test reports, you may wish to contact us.

Defendants received no reply to Reed's letter just quoted (T158–59, 585). The Moores were then dealing with the defendants through their lawyer (T582). At this point, defendants had the independent test reports described in the letter and had received no comment from the Moores on the conclusions of non-compliance by the independent tests. Reed understood the then position of the Moores to be as follows (T582):

The demands as I understood them, which have been continuing, is that we merely should accept any and all versions of the 701 light [the Moore lamp] based on the California certificates. At no time did they ever want to discuss the matter of whether or not they were in conformance with tests or anything like that.

Reed believed that in the face of independent test reports showing that the Moore lamp did not comply with federal safety standards, the defendants could no longer certify as complying with those standards trailers which used the non-complying Moore lamp. Defendants therefore under date of February 3, 1977, sent a bulletin to the trailer manufacturer members, the last paragraph of which reads as follows (PX15):

It was also brought out at the Annual Meeting that the Dry Launch 701 Series lamps had been challenged as not meeting the photometric requirements of Federal Standard 108. Tests by several independent laboratories of the two different styles of 701 series fixtures with respect to the design of the side marker lamp lens have confirmed the challenge. Consequently, TMA cannot certify trailers which use the Dry Launch 701 Series lamps. The test reports are available for inspection at the Association offices by any member. While we are not permitting the use of these lamps in the TMA Certification Program, we are not aware of any present restrictions to the sale of these lamps anywhere.

While this bulletin was dated February 3, 1977, it was not sent out until mid-February 1977 because defendants were waiting to see whether the Moores would answer the January 17, 1977, letter (T585). They never did (*id.*).

The bulletin quoted does not in any way evidence a "group boycott." On the contrary, it makes it clear that the decision whether to buy the Moore lamp is entirely up to each member. The test reports on which defendants relied were made available to each member. It is stated that the defendants do not know of "any present restriction" on the sale of the Moore lamps. It seems conclusively to establish that it is up to each member, as a matter of individual decision, to buy or not to buy the Moore lamps; there was no evidence here, or at any other place in the record, that there was any agreement (express or implied) that members would not buy products which were not certified by TMA to comply with federal safety standards. TMA made

no suggestion that any trailer manufacturer should refuse to buy Moore lamps. The test reports were made available so that each could determine whether there was sufficient information shown to indicate noncompliance with the Safety Act by the Moore lamps. Whether the individual trailer manufacturer wished to use the Moore lamps after appraising the risks of federal civil fines and recall was a matter for that individual to decide; there was no agreement for, nor any suggestion of, a group boycott.

5.

■ The Moores, however, seem early to have determined to sue the defendants and on April 15, 1977, this action was commenced. While it is not of any controlling significance, there is reason to suppose that the case at bar was a part of the strategy of the Moores in a long controversy with Wesbar, a lamp maker competitor, arising from claimed infringement by Wesbar of the Bloodgood patent (bought by the Moores) and from charges that Wesbar disparaged the Moore lamps.

In any event, the complaint as filed in the case at bar contained four separate claims in four separate counts against defendants here.

The first three claims, which appear to be the principal thrust of the action and occupy the first 21 of the 30 paragraphs of the complaint, charge product disparagement under the common law, under an Illinois statute, and as the object of a conspiracy. The disparagement is alleged to have occurred on September 29, 1976 [mistakenly averred as "September 30, 1976"] when, at the Annual Meeting of the Trailer Manufacturers Association, Reed stated to "the boat trailer manufacturers" that the Moore lights "were illegal." It is averred that this statement was false and that in fact the Moore lamps were certified by California and Virginia "as meeting all requirements for sale by those states" and were certified by American Association of Motor Vehicle Administrators (AAMVA) "which certifications collectively certify"

that the Moore lamps "are legal for use and sale" in all the states. There is no averment that the Moore lamps met *federal* safety standards as established under the Safety Act; surprisingly, there is no reference to *federal* safety standards or to the *federal* Safety Act at any place in the complaint. This presumably was deliberate because there was no attempt later at trial by plaintiffs to prove that the Moore lamps did in fact comply with *federal* standards and no issue of such compliance was submitted to the jury by the trial court. Thus, there has been no finding in the case at bar that the Moore lamps did in fact comply with federal standards at the relevant times.

It is repeatedly emphasized in the first three claims that the alleged disparagement of the Moore lamps as "illegal" was made at the TMA Annual Meeting to "boat trailer manufacturers" to whom the Moores sell their lamps, who are customers of the Moores, and some of whom were even at the time of the alleged disparagement "in the process of negotiating with Dry Launch [the Moores] for the purchase of boat trailer lights." This further demonstrates what seems so obvious—that the defendants, as boat trailer manufacturers, are *not competitors* of lamp maker the Moores, but are instead their customers, with no conceivable anticompetitive motive against them.

The fourth claim, and the only one on which the Moores recovered a judgment, is for violation of the federal antitrust laws, 15 U.S.C. §§ 1, 2, and is sometimes referred to in the record as the antitrust claim. The principal averments in the antitrust claim are that the trailer manufacturers had, and accomplished, the following objects: to eliminate competition from the Moores in the sale of trailer lights; to maintain a monopoly in the sale of trailer lights; to "collectively boycott" Moore trailer lights (para. 28(d)); to "refuse to certify boat trailers" which use Moore lights, knowing that there are no restrictions anywhere on the sale of Moore lights (*id.*); and to eliminate competition in trailer lights by a "group boycott" of Moore lights (para. 28(f)).

The motive of the defendants, as alleged in the antitrust count of the complaint, was to eliminate competition and to maintain a monopoly in the sale of trailer lamps; such an alleged motive would be completely illogical. At the risk of repetition, it must be stressed that boat trailer manufacturers do not *make* trailer lamps but *buy* them from the Moores and other lamp makers. Boat trailer manufacturers, against whom the antitrust claim is directed, do not have a monopoly of boat trailer *lamps* and, since they make no lamps, could never achieve such a monopoly.

6.

The trial of the case at bar began on Monday, November 2, 1981, before Judge Moran and a jury.

While the Moores' action against Wesbar and Weber, had been commenced after the case at bar, it had been brought earlier to trial on April 7, 1981, before Chief Judge Reynolds in the Eastern District of Wisconsin and had been concluded. The jury in the Wesbar case found that Wesbar and Weber had infringed the Bloodgood patent (owned by the Moores) but by decision and order filed September 1, 1981, Chief Judge Reynolds held the patent invalid because obvious and ordered judgment for defendants on that claim. The jury by special verdict found that Wesbar and Weber had disparaged the Moore lamps but that the Moores "had not suffered loss of specific sales, had not incurred damages in taking measures to counteract the disparagement, and had not suffered damages as a result of a general decline in [their] business" (decision and order filed Sept. 1, 1981 in 78–C–624 in E.D.Wis., p.1; unpublished). Chief Judge Reynolds therefore ordered judgment for defendants on the product disparagement claim also.

By the time the trial of the case at bar began on November 2, 1981, the third count of the complaint, that for conspiracy to disparage the Moore lamps, had been eliminated. When and how this was accomplished is not made to appear in the record or briefs. In any event, the trial

was on three claims, the first and second for common law and statutory product disparagement (that the Moore lamps "were illegal") and a third claim (the original fourth count) for antitrust violation.

7.

The Moores presented as their witnesses on their case in chief Dennis Moore, Gromlovitz (a trailer manufacturer and a customer of the Moores but not a member of either defendant association), Fye (an Ocala, Florida sales representative in the sporting goods and marine industries), and Reed (the individual defendant). The Moores read from the depositions of Weber (president of Wesbar), Myers (an employee of CHP), and Shepard (another employee of CHP). The Moores called no trailer manufacturer member of either defendant association and presented no evidence of any agreement, combination, or conspiracy to boycott and refuse to deal with the Moores, presented no evidence showing what the certification program was, and presented no evidence that any member of either defendant association refused to buy lamps from the Moores because they were not certified by TMA as in compliance with federal safety laws.

The defendants on their case called as witnesses James Moore (a trailer manufacturer, a member of TMA, and not related to plaintiff Moores), Reed (the individual defendant), and King (head of Ann Arbor Testing Laboratory, which tested Moore lights for TMA in November 1976).

The Moores called George Moore as a brief witness in rebuttal.

The defendants then recalled Reed and James Moore briefly, and the presentation of evidence for both sides ended (T672).

While much of the factual background has already been given, mention should be made here of some specific evidence presented at trial.

The defendants offered disinterested and undisputed testimony of James Moore, not related to the plaintiff Moores, that until 1979 he had been president of a trailer manufacturer in Kentucky, that because of a fire the company went out of business in 1979, that before 1979 his company had been a member of TMA but not thereafter, that he attended the September 29, 1976, annual meeting of TMA, and that he remembered the discussion of several trailer lamps which "were in question" (T559–63). He was asked (T564): "At any time during that 1976 boat show meeting, TMA meeting, did Don Reed say that the Dry Launch 701 light was illegal?"; his answer was: "No, sir, he didn't." The plaintiffs offered no evidence that at the September 29, 1976 TMA meeting Reed said that the Dry Launch [Moore] lights "were illegal" (the precise averment in para. 7 of the complaint). There was thus a complete failure of proof of one of the basic averments in the complaint, that Reed "maliciously defamed the boat trailer lights manufactured and sold by Dry Launch by willfully and wantonly declaring to these representatives of the boat trailer manufacturers that Dry Launch boat trailer lights were illegal" (para. 7).

The plaintiffs offered testimony by Gromlovitz (T92–118), a trailer manufacturer from August 1975 to the spring of 1977 (T92), whose company was in "pretty good shape" when he left it (T92), whose company was not a member of TMA or BIA (T93) but had been asked to join (T96–97), whose company used Moore lamps "exclusively" (T93), and who considered becoming a member of BIA and TMA but did not do so (T97–98). Gromlovitz further testified that it was a "little prestigious" to be a member of the associations (T96) and "important ... to be a participant in the TMA certification program," and that the reason this was "important" was "mainly because the boating manufacturers had asked us if we would join the BIA and TMA" (T97–98). However "prestigious" and "important" it may have seemed to be a member of TMA and BIA, Gromlovitz never felt that his company needed to be a member.

Gromlovitz testified (T101) that he attended the TMA September 29, 1976, meeting; that Reed, in response to questions from the floor, said that the Moore lamp "was not DOT approved"; that the meet-

ing lasted about one hour; that the discussion of federal safety law compliance of trailer lamps lasted about five minutes; and that he continued to use Moore lamps without TMA certification of compliance (T113–15) and (so far as appears) without any adverse business effect.

The plaintiffs offered testimony of Fye, a sales representative in Ocala, Florida, in the sporting goods and marine industries (T122–23). Fye testified that after "the Chicago trade show in 1976" there were "unfavorable comments" about the Moore lights because the "word got around very fast ..." (T129–30).

■ Dennis Moore testified that on September 30, 1976, he heard from a customer, Gromlovitz, reporting the questions raised at the TMA meeting the day before about the compliance of Moore lamps with federal safety standards (T139–40). Dennis testified that he then took to defendants "copies of our certificates for ... California, the state AAMVA and Virginia" (T140); "I went down to them with these certificates" (T140); "I was bringing down my certificates for the various states" (T141). The Moores had no *federal* certificate of compliance with federal safety laws; the federal safety authorities have never issued any such certificates. The Moores produced to defendants two *California* certificates of "approval" dated April 15, 1974 (PX2, 3), a *Virginia* letter dated March 22, 1974, stating that the Moore lights "may be used and sold in *Virginia* without further approval" (PX1), and two AAMVA certificates (*not* federal) of "equipment approval" (PX4, 5) dated April 5, 1974, stating that the Moore lamp as described "is hereby approved for sale and use in those jurisdictions accepting this certificate as compliance with their local requirements." These *state* or *state* recognized certificates of approval for sale do not establish compliance with *federal* motor vehicle safety standards. The *state* certificates were moreover out of date to "disprove" reports of non-compliance in September 1976; they were issued in early 1974, had been questioned since then by at least one of the issuing authorities (California), and the design of the lamps had been entirely changed by the Moores in response to those questions.

As a preliminary to the testimony of Dennis on damages—the only evidence on that subject—it appeared that while the case at bar was pending, the Moores made further changes in their lamps, as a result of which the defendants were satisfied that they could certify trailers using those lamps as in compliance with federal safety laws.

Under date of March 18, 1977, CHP wrote to Dennis, referring to their tests of his lamps in December 1976 and to their notification to him "by telephone of their failure and our intention to cancel the Certificate" (PX40). CHP pointed out that "there is need for a left and right bulb holder"; that if different bulb holders were used the new lamps would meet photometric requirements; that CHP would require—to be satisfied of compliance—that "the bulb holder be indexed" and, if not, "it will be necessary for us to withdraw our approval of the devices with the non-indexed holders" (PX40).

After more than a year had passed, CHP had not been so satisfied and finally, under date of April 17, 1978, CHP wrote to Dennis requesting "that you incorporate changes to your tooling to achieve compliance with State and federal regulations" (PX41). Samples were asked for after the changes.

Samples were apparently submitted by Dennis in May 1978 after the requested changes had been made (PX8). Under date of June 6, 1978, CHP wrote Dennis that, after testing the samples, it believed they "met the requirements" but some data "were marginal" and CHP asked: "please notify us of the steps you are taking to ensure the production units do not slip out of compliance" (PX8). Dennis did notify CHP of these steps and CHP at last was satisfied (PX43).

The defendants learned of the changes made by the Moores, the samples submitted, and that CHP testing indicated that the Moore lights were in compliance with federal safety standards. Under date of October 11, 1978, Trailer Manufacturers

Association sent a Technical Bulletin to its members, first referring to its earlier bulletin of February 3, 1977, about non-compliance of Moore lights and then in relevant part stating (PX26):

Since that time [February 3, 1977] the side marker lenses of those lights have been redesigned, and we have recently received materials prepared by the California Highway Patrol indicating its satisfaction that the redesigned lights are in compliance. Dry Launch model 701 and 701L lights incorporating this design change may be used on trailers in our certification program.

So ended the inability of defendants to certify Moore lamps as in compliance with federal safety standard 108.

The theory of damages to which Dennis testified was a comparison of sales of the Moore lights (specifically the "Model 700 light" (T219)) for the roughly two year period from September 29, 1976 to October 11, 1978 (date of the technical bulletin that Moore lights then complied with federal safety standards) with the two year period from the September 1979 Chicago boat show to two years thereafter (T219–21).

The testimony of Dennis as to damages is hopelessly confused and long study does not lead to any understanding of it. He testified as follows (T229):

[F]or the time period I just described, the eight quarters after the start of the '80 boat trailer season which was September of '79, the difference between those eight quarters and the eight quarters previously, previous to that was 30,657 pairs of Model 700 lights that we sold to the TMA approved trailer manufacturers.

Q. 30,657?

A. Yes.

Q. Now, that is the number of lights or is that pairs of lights?

A. That is pairs of lights.

He apparently contends that, because of the defendants' conduct, he lost the sale of 30,657 pairs of lights "to the TMA approved trailer manufacturers" (whatever that may mean). He then "calculated" his profit and "averaged it between the two years" (T229); his "loss of profits" was $1.39 per light according to his calculations, or $85,226 for 30,677 pairs (T230). Dennis testified that the volume of sales to trailer manufacturers affected the aftermarket or replacement sales; that had he been able to sell 30,657 pairs of lights to trailer manufacturers, his "opinion" and "as a conservative estimate" was that "we would recognize at least half of that again in sales in the aftermarket ..." (T234); that he "calculated" a profit of $1.91 per pair in the aftermarket (T234); and that the "figure" for "loss of profits" of aftermarket sales based on 50% of the 30,657 assumed lost sales was $58,555 (T238). He testified that in addition there was a "theft market" of 20% of sales of lamps to trailer manufacturers, (T238) from which he calculated additional lost profits of $23,420. The total of the three figures ($85,226; $58,555 and $23,420) was $167,201, which admittedly was not "damage" but "loss of profit" (T230). The entire basis for the lost profits claim was speculation, opinion, and estimates, unsupported by any financial records. Moreover, there is no evidence that the Moore business in trailer lamps at any time before the acts charged here had ever, in any year, made more than a minuscule profit. [There is in the record on appeal the transcript of a deposition of plaintiff George Moore on April 26, 1978, taken by defendants. It is unclear whether this deposition was ever offered or received in evidence. According to this sworn testimony of a plaintiff, however, the net profit of the Moores from lamp sales in 1973 was "nebulous" and "zero"; in 1974, "zero"; in 1975, "I doubt it"; in 1976, "$10,000"; in 1977, as an "educated guess ... $20,000"; in 1978, "increasing" but primarily because of one account, EZ Loader, a trailer manufacturer and a member of the defendant TMA. According to this testimony, there could never have been any such "lost profits" of $167,201 as (trebled) were awarded by the judgment in the District Court.]

When asked by his own lawyer if he knew of "any specific sales to TMA members lost because of the statements that were made about your lights," Dennis answered and admitted (T225): "I can't put

my finger on it. I mean, they weren't willing to talk to me, so I don't know really what I lost or what I would have lost."

### 8.

The summation of counsel for the Moores was devoted principally to the two product disparagement claims; these occupy something over sixteen pages in the transcript as contrasted with a little less than two pages of summation for the antitrust claim.

The argument to the jury for the Moores on the antitrust claim is entirely on the theory that the TMA certification program constituted "standards" set by defendant associations, which was not the fact; the standards were set by the Congress and by the Secretary. The argument went on that the standards set by the defendants were not fairly and objectively established and applied but were applied against the Moores arbitrarily and unreasonably. This is the theory based on *Silver*, which, as now established by *Northwest*, is not applicable here.

The argument to the jury for the Moores on the antitrust claim was solely that the Moore lights "were treated [by defendants] in a discriminatory manner" (T692) and that this was "arbitrary and unreasonable" (T693). The argument then expanded the same theme to its conclusion (T693):

> Now, the Boating Industry Associations will contend, and you will be instructed, that all restraints of trade are not necessarily unreasonable, and that trade associations may set standards which are restraints [which was not in fact done here] but which—and this is the key language—if fairly and objectively, fairly and objectively established and applied, fairly and objectively applied.

> The Boating Industry Associations, the Trailer Manufacturers Association, when they denied approval of the use of Dry Launch boat trailer lights in their certification program, they acted [in] an unreasonable and arbitrary manner. Arbitrary and [un]reasonable: those are the two facts.

The facts show that this action by the Boating Industry Association was not a fair and objective application of the program to Dry Launch but was done in an unreasonable and arbitrary manner.

### 9.

The instructions of the trial judge on the antitrust claim were based entirely on the foregoing theory of *Silver*, and went on with other errors on that claim as well.

The three claims were submitted to the jury on November 10, 1981, for written answers to questions on "Special Verdict Forms," one sheet for each claim.

On the antitrust claim, the answer of the jury on the form as returned later on the same day was: "On the issue of violation of Section One of the Sherman Antitrust Act, we find for: Plaintiffs." To a further question on the same form—"2. What was the amount of Plaintiffs' damages as a result of Defendants' violation of Section One of the Sherman Antitrust Act?"—the answer was "$200,000."

The jury answered special questions in favor of plaintiffs on the claims for common law and statutory product disparagement. Damages of $200,000 were awarded to plaintiffs on the common law disparagement claim. The jury was not asked to award damages on the statutory disparagement claim because the verdict was advisory only as to liability on that claim.

### 10.

On November 18, 1981, defendants filed in the trial court a motion for judgment notwithstanding the verdict and for a new trial (Fed.R.Civ.P. 50). There were a number of briefs submitted by both sides over a substantial period of time.

Evidently whether the evidence was sufficient to support the special verdict returned by the jury proved troubling to the trial judge, who kept the post-trial motion under advisement for some time and decided it by memorandum opinion and order dated May 24, 1983, shown as entered in the docket on May 25, 1983.

Judge Moran found (p. 3) that Reed "on September 29, 1976 told an assembly of manufacturers that Dry Launch lights were not approved by the Department of Transportation."

The trial judge stated the basis for the jury verdict as follows (p. 5): "The jury could reasonably conclude, as it did, that plaintiffs were arbitrarily treated."

The trial judge then found that on the common law disparagement claim there should be judgment for defendants notwithstanding the verdict because there was "not sufficient" evidence to support the jury finding of "actual malice" and because "the evidence just does not support a finding of reckless disregard." The trial judge, apparently by oversight, did not decide the motion of defendants as to the statutory disparagement claim.

The trial judge denied the motion of defendants for judgment n.o.v. on the antitrust claim, but in contrast with the other claims this had been evidently a very difficult decision for him. His decision was based entirely on his understanding, now shown by the Supreme Court in *Northwest* to have been mistaken, of *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963). Judge Moran first found that there was no anticompetitive purpose in the acts of defendants. "There was no evidence, however, that this concerted activity had as its purpose anything other than the promotion of compliance with the federal requirements" (p. 7). He added that the activity had "laudatory purposes" (p. 7). But, in mistaken reliance on *Silver* and in the mistaken belief that the certification program of defendants was "industry self-regulation," he then concluded that there was an antitrust violation because there had been no "procedural safeguards which assure that the restraint is not arbitrary" (p. 8). Judge Moran explained this as follows (pp. 7, 8, 9):

Clearly there is nothing inherently illegal about the standards program or the certification program. They are justified by the self-certification requirements of federal law. *See Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct.

1246, 10 L.Ed.2d 389 (1963). The programs themselves are not naked restraints. If such programs are carried out arbitrarily and unreasonably, however, to call that a *per se* violation because it is a naked restraint or to call it a violation because it is an unreasonable restraint seems to be of little moment.

\* \* \* \* \* \*

Had the program been fairly and reasonably conducted, without anticompetitive purpose or effect or discriminatory application and with reasonable enforcement procedures, it would not be subject to attack under antitrust laws. *See e.g. Silver v. New York Stock Exchange, supra,* . . . . Permissible industry self-regulation requires not only a legislative mandate for self-regulation "or otherwise" and collective action intended to accomplish an end consistent with the policy justifying self-regulation, reasonably related to that goal and no more extensive than necessary, but also procedural safeguards which assure that the restraint is not arbitrary . . . . If determinations are, however, arbitrary, they run afoul of the Sherman Act, . . . despite the best of intentions . . . . The vice here—or so the jury could reasonably conclude—was that the plaintiffs were hanged at the September meeting before they were tried, that the Association has no clearly defined structure for dealing with complaints of the nature it received and it thereafter, in the absence of any defined structure, followed an *ad hoc* procedure which went beyond that which was necessary to further the certification program and which did not give plaintiffs their opportunity to contest and thereby contain the competitive injury occasioned by the Association pronouncements at the September 1976 meeting.

The trial judge did note that the damages awarded by the jury exceeded the $167,201 figure estimated by Dennis as the profits lost by him from the claimed acts of defendants. Judge Moran reduced the damages accordingly.

### 11.

After the decision of Judge Moran on the post-trial motion of defendants, plaintiffs moved for judgment as to damages on their statutory product disparagement claim; the jury verdict on that claim had been advisory only as to that claim. The motion as to the statutory product disparagement claim was denied by memorandum and order entered on the docket June 17, 1983.

By notice of appeal filed in the District Court on June 21, 1983, the defendants appealed to this Court from the judgment entered against them on November 10, 1981 and from the order entered on May 24, 1983 [in fact, entered on May 25, 1983] in part denying their post-trial motion.

By notice of appeal filed in the District Court on June 28, 1983, the plaintiffs appealed to this Court from the orders granting judgment for defendants on the common law product disparagement claim and denying the motion of plaintiffs for judgment on the statutory product disparagement claim.

The argument of the appeal of defendants and the cross-appeal of plaintiffs was heard by this Court on May 30, 1984. Our opinion and decision was filed on January 30, 1985 (754 F.2d 698; *"Moore I"*).

### 12.

A few months after January 30, 1985, when our first decision was filed, the Supreme Court on June 11, 1985, handed down its opinion and decision in *Northwest* and thereby rejected the reasoning of our first decision.

Pacific had been for many years a member of Northwest, a cooperative buying agency, and enjoyed a competitive advantage from the ability to purchase more cheaply through the cooperative. Northwest expelled Pacific from membership without any notice, any hearing, or any other opportunity to challenge the expulsion. Pacific then sued Northwest for violation of the Sherman Act on the theory that, under *Silver*, the expulsion "without procedural protections was a group boycott that limited Pacific's ability to compete and

should be considered *per se* violative of § 1," 472 U.S. at 288, 105 S.Ct. at 2616. The District Court made a rule of reason analysis and, finding no anticompetitive effect shown by the record, granted summary judgment for Northwest. *See Northwest,* 715 F.2d 1393, 1395 (9th Cir.1983). The Ninth Circuit Court of Appeals, relying importantly on *Silver* and over a dissent, reversed the judgment for defendant Northwest and held, as the Supreme Court later related, 472 U.S. at 288–89, 105 S.Ct. at 2616–17, that, while Congress had given Northwest a mandate for self-regulation, Northwest had not provided any procedural safeguards, and that its expulsion of Pacific "therefore constituted a *per se* group boycott in violation of § 1 of the Sherman Act. 715 F.2d at 1395–98."

That the review by the Supreme Court in *Northwest* was directly addressed to the problems we now face is shown by the first two sentences of the *Northwest* opinion:

> This case requires that we decide whether a *per se* violation of § 1 of the Sherman Act, 15 U.S.C. § 1, occurs when a cooperative buying agency comprising various retailers expels a member without providing any procedural means for challenging the expulsion.[1] The case also raises broader questions as to when *per se* antitrust analysis is appropriately applied to joint activity that is susceptible of being characterized as a concerted refusal to deal.

472 U.S. at 285–86, 105 S.Ct. at 2615 (footnote omitted).

The Supreme Court unanimously reversed the Ninth Circuit Court of Appeals, holding that it was error for that Court to apply a *per se* analysis to the *Northwest* situation, and that a "rule-of-reason analysis" should have been used. The Court explained:

> A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted re-

fusals to deal are predominantly anticompetitive.

472 U.S. at 298, 105 S.Ct. at 2621.

The Supreme Court then concluded:

It does not denigrate the *per se* approach to suggest care in application. In this case, the Court of Appeals failed to exercise the requisite care and applied *per se* analysis inappropriately.

### 13.

Shortly after our first opinion had been filed on January 30, 1985, *Northwest* was argued in the Supreme Court on February 19, 1985. Defendants in the case at bar undoubtedly knew when it had been taken under advisement and of course were aware of the decision on June 11, 1985. Defendants here had obtained from the Circuit Justice extensions of time to file a petition for certiorari, the last extension expiring on August 12, 1985.

On August 9, 1985, the defendants filed in the Supreme Court a petition for a writ of certiorari.

The basis for the petition was that under the then recent decision in *Northwest* this Court had erred in finding a group boycott by petitioners in violation of the Sherman Act "because they failed to afford [the Moores] adequate process before declining to certify boat trailers using [Moore] tail lights." Pet. for Cert. (i) ("Question Presented").

The petition quoted the erroneous instructions to the jury and correctly pointed out that "the jury was permitted to return a verdict against petitioners [on the antitrust claim] based *solely* on what the jury might conclude were procedural shortcomings in petitioners' certification program...." Pet. for Cert. 5–6 (emphasis supplied). The petition pointed out that our decision in *Moore I* was "wholly inconsistent" with the Supreme Court's *Northwest* principle that "the absence of procedural safeguards can in no sense determine the antitrust analysis." *Id.* at 9. The petition pointed out "the absence of any evidence of anticompetitive intent," *id.* at 10, and that no antitrust violation could be found (and certainly not a *per se* violation) solely from arbitrary and unreasonable procedures.

The brief for the Moores opposing the petition did not dispute the effect of the instructions given to the jury by the trial judge, urged by petitioners to have been erroneous.

On October 15, 1985, the Supreme Court granted the petition, vacated our judgment, and remanded the case to this Court for further consideration in light of *Northwest.* — U.S. ——, 106 S.Ct. 218, 88 L.Ed.2d 218.

### 14.

■ After a study of the *Northwest* opinion of the Supreme Court, we are bound to conclude that the judgment below for plaintiffs on the antitrust claim, based solely on arbitrary and unreasonable procedural treatment of them and without a rule of reason analysis to determine whether there was any anticompetitive motive or effect by defendants, cannot stand. According to the principles expressed in *Northwest,* our earlier decision "applied *per se* analysis inappropriately," 472 U.S. at 298, 105 S.Ct. at 2622.

The Supreme Court in *Northwest* explained that its *Silver* decision was an instance where "self-regulation" of an industry had been an "essential policy" of an Act of Congress (in *Silver* it was the Securities Exchange Act) and that a partial repeal of the Sherman Act was intended by Congress in situations where "adequate procedural safeguards had been provided," 472 U.S. at 292, 105 S.Ct. at 2618, in respect of actions taken to effect self-regulation. There is no such situation in the case at bar. The Safety Act, unlike the Securities Exchange Act in *Silver,* does not rely on any "self-regulation" whatever. The Safety Act provides its own standards and its own methods of enforcing them.

To promote compliance with the Safety Act and the standards under it, admittedly the purpose of defendants in their compliance program, is not an activity which is "characteristically ... likely to result in

predominantly anticompetitive effects," 472 U.S. at 296, 105 S.Ct. at 2621. There is no justification, therefore, for applying a *per se* analysis to such activity. No matter how "arbitrary and unreasonable" the conduct of defendants toward the Moores may have been, the *Northwest* opinion is clear that such conduct would not convert the "challenged action ... into a *per se* violation," 472 U.S. at 293, 105 S.Ct. at 2619. We must give effect to the emphatic statement in *Northwest* that "the absence of procedural safeguards can in no sense determine the antitrust analysis," 472 U.S. at 293, 105 S.Ct. at 2619.

### 15.

The instructions of the trial court to the jury on the antitrust claim, based on a mistaken view of the *Silver* decision, were erroneous and highly prejudicial to defendants.

The most significant part of the erroneous instructions was the removal from the jury's consideration, which should have been made under the rule of reason, of the anticompetitive effects of the claimed group boycott by defendants and the direction in substance that the jury find a *per se* violation by defendants if the jury found that "in their certification program" they had acted in an "unreasonable and arbitrary manner." This was done in the following instruction (T728–29, emphasis supplied):

> Trade associations may set standards which are restraints but which, if fairly and objectively established and applied, are not unreasonable restraints of trade.
>
> If you find by a preponderance of the evidence that the defendant associations in denying approval to the use of Dry Launch boat lights in their certification program acted for an anticompetitive purpose *or* in an unreasonable and arbitrary manner, you should find for the plaintiffs on their Sherman act claim.
>
> If on the other hand the defendant associations in denying that approval acted fairly and reasonably to implement their certification program, you should

find for defendants on the antitrust claim.

The jury was thus told that there should be a verdict for plaintiffs (evidently as a *per se* group boycott antitrust violation) if defendants were "unreasonable and arbitrary" in their conduct and without regard to whether there had been any anticompetitive effects of that conduct or not. The instruction was prejudicially mistaken because the jury was told to find for the Moores on *either one* of *two* bases: (a) the denial of "approval" by defendants was "for an anticompetitive purpose" or (b) the denial of "approval" was "unreasonable and arbitrary."

The jurors were told that they should find for defendants on the antitrust claim on only *one* basis: if they found that defendants had "acted fairly and reasonably to implement their certification program." The jurors were *not* told that they should find for defendants if they found under the rule of reason that defendants had no anticompetitive purpose in their efforts to encourage compliance with *federal* safety laws.

Such an instruction flies in the face of the now explicit direction in *Northwest*:

> A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive.

472 U.S. at 298, 105 S.Ct. at 2621.

It should be noted that this Court, in *U.S. Trotting Association v. Chicago Downs, Inc.,* 665 F.2d 781 (1981) had to some extent anticipated the result in *Northwest.* In *Chicago Downs,* then Chief Judge Cummings wrote, for an en banc court, reversing a summary judgment enjoining a group boycott as a *per se* antitrust violation and instead finding that the rule of reason should have been applied. Judge Cummings wrote: "Here the attributes of *per se* invalidity ... are not present. There is concerted activity only in

the sense that USTA is a membership corporation enforcing rules contained in its by-laws. There is no showing of a purpose to exclude competitors." 665 F.2d at 788. Judge Cummings also quoted with approval from an earlier opinion: "[A *per se* rule] should not be applied, and has never been applied by the Supreme Court, to concerted refusals that are not designed to drive out competitors but to achieve some other goal." *Id.* There was no "concerted action" shown here to drive out competitors; the trailer manufacturers do not in fact compete with the lamp maker Moores. The jury instructions of the trial court in the case at bar wrongly removed anticompetitive effects and the rule of reason from the jury's consideration.

There were further prejudicial errors in the trial court's charge to the jury, already quoted. The trial court told the jury (T728) that "[t]rade associations may set standards which are restraints but which, if fairly and objectively established and applied, are not unreasonable restraints of trade." This is not in fact an accurate statement with reference to the case at bar. The "standards" which were the subject of the lawsuit were *not* set by the defendant associations but were instead federal highway safety standards set by the Congress acting through the Secretary of Transportation. In the instructions quoted, the trial court also told the jury that the defendants denied "approval" to the use of Moore lamps in their "certification program" whereas it is beyond dispute that no "approval" by defendants was involved; the question for defendants was whether they could properly certify that the Moore lamps complied with federal safety standards.

### 16.

▮▮▮ The trial judge also gave other mistaken instructions to the jury when, with reference to what he described as the "conspiracy among some or all of the defendants to collectively refuse without justifiable purpose to deal with and collectively boycott the plaintiff's boat trailer lights"

(T726), he instructed the jury (T727–28; emphasis supplied):

A combination or conspiracy involves an agreement, understanding or concertive [thus in the original; probably "concerted" was intended] action between two or more persons to accomplish some unlawful purpose or to accomplish some lawful purpose by unlawful means....

*A trade association is by its nature involved in concerted action....*

The issue here is whether plaintiffs have proved by a preponderance of the evidence that the defendants engaged in concerted action to accomplish some unlawful purpose or to accomplish some lawful purpose by unlawful means and have, therefore, engaged in an unlawful combination or conspiracy.

This instruction is erroneous and prejudicial to defendants because a trade association is not always and at all times "involved in concerted action," either "by its nature" or otherwise. "[M]ere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws.... There must, instead, be some evidence of actual knowledge of, and participation in, an illegal scheme in order to establish a violation of the antitrust laws by a particular association member." T. Vakerics, *Antitrust Basics*, § 6.13 at 6–37 to –38 (1985).

### 17.

Had plaintiffs submitted at trial sufficient evidence to show a group boycott of plaintiffs by defendants, the serious errors in the jury instructions would require that the action be remanded for a new trial on proper instructions. But there was no evidence sufficient to show any group boycott by defendants, despite the focus on this assertion in the complaint itself (paras. 29(d) and (f), for example). The proper disposition of the antitrust claim, therefore, is to reverse the judgment on that claim and to direct judgment on that claim for defendants. Since there was no evidence which would on any theory support a verdict for plaintiffs on the antitrust claim,

had proper instructions been given to the jury, there is no necessity nor reason to remand for a new trial.

The argument of the Moores that there was a group boycott appears largely to be based on the certification program of defendants. The emphasis on the certification program in the arguments for the Moores seems curious because neither side produced at trial any evidence to show what the "certification program" was. It seems to be undisputed that there was a "certification program" but what were its terms and provisions is not shown by the record. There is no evidence of the form of certification, nor of the extent of the participation in the program, nor of any agreement by the members in respect of the program. There certainly was no evidence whatever that the certification program included any agreement that members of TMA would not buy products not certified by defendants. *No certificate issued by defendants is in evidence*, but from what does appear the certificate, if issued, is entirely objective: the product complies with Federal Safety Act standards.

The failure of plaintiffs to produce any evidence whatever of the provisions of the "certification program" means that there is no evidence of any group boycott of the Moores. Had there been evidence that the certification program included an agreement (or by-law of the association from which an agreement could be inferred) by the members to buy only products certified by TMA as in compliance with federal law, there might be some basis for a contention of a "group boycott." But there is no such evidence. Indeed, there was uncontradicted testimony that some members of TMA do not participate in the "certification program" (T389). Moreover, the exposure to recalls and civil fines is a compelling, independent explanation for the decision of any trailer manufacturer not to buy trailer lamps, the compliance of which with federal standards was, at the very least, doubtful.

The plaintiffs have not shown on the record before us that there was in fact any group boycott of them by the defendants.

In summary, and at the risk of some repetition, the Moores called no trailer manufacturer member of either defendant association and presented no evidence of any agreement, combination, or conspiracy to boycott and refuse to deal with the Moores, presented no evidence showing what the certification program was, and presented no evidence that any member of either defendant association refused to buy lamps from the Moores because they were not certified by TMA as in compliance with federal safety laws. As earlier related, when asked if he knew of any specific sales lost to TMA members because of the conduct of defendants, plaintiff Dennis admitted: "I can't put my finger on it" (T225).

18.

We did not address in our earlier decision the cross-appeal of plaintiffs in No. 83–2201 because we were affirming the judgment for them on the antitrust claim, 754 F.2d at 719 n. 33. The cross-appeal seeks review of the orders granting judgment for defendants on the common law product disparagement claim and denying the motion of plaintiffs for judgment in their favor on the statutory product disparagement claim.

Since we are now reversing the judgment for plaintiffs on their antitrust claim and directing judgment for defendants on that claim, we must address the issues raised by plaintiffs on their cross-appeal in No. 83–2201. On those issues and after careful study of the record before us, we affirm the orders of the District Court from which the plaintiffs have appealed and we do so substantially for the reasons given by Judge Moran in his unpublished memoranda and orders dated May 24, 1983, and June 14, 1983.

The judgment on the antitrust claim from which defendants have appealed in No. 83–2148 is hereby reversed and judgment on that claim is directed to be entered for defendants.

The orders on the two product disparagement claims from which plaintiffs have appealed in No. 83–2201 are hereby affirmed.