**SEWELL PLASTICS, INC., Plaintiff,**

v.

**The COCA–COLA COMPANY (doing business through its division, Coca–Cola USA); Southeastern Container, Inc.; Aberdeen Coca–Cola Bottling Co., Inc.; Alabama Coca–Cola Bottling Company; Biscoe Coca–Cola Bottling Company, Inc.; Carolina Coca–Cola Bottling Co., Inc.; Coca–Cola Bottling Company Consolidated; Coca–Cola Bottling Company of Anderson, South Carolina, Inc.; Coca–Cola Bottling Company of Asheville, N.C.; Coca–Cola Bottling Company of Mobile; Coca–Cola Bottling Company of Nashville, Inc.; Coca–Cola Bottling Company of Roanoke, Inc.; Coca–Cola Bottling Company of Wilson, Inc.; Coca–Cola Bottling Company United, Inc.; Coca–Cola Bottling Works of Tullahoma, Inc.; Columbia Coca–Cola Bottling Company; Columbus Coca–Cola Bottling Company; Dorchester Coca–Cola Bottling Company; Durham Coca–Cola Bottling Company, Inc.; Eastern Carolina Coca–Cola Bottling Company, Inc.; Fayetteville Coca–Cola Bottling Company; Hampton Bottling Works, Inc.; Lincolnton Coca–Cola Bottling Co., Inc.; Mid South Coca–Cola Bottling Company; Orangeburg Coca–Cola Bottling Co., Inc.; Plymouth Coca–Cola Bottling Co., Inc.; Rock Hill Coca–Cola Bottling Co.; Roddy Manufacturing Company; Sanford Coca–Cola Bottling Company; Tarboro Coca–Cola Bottling Company, Inc.; The Atlanta Coca–Cola Bottling Company; The Coastal Coca–Cola Bottling Company; The Coca–Cola Bottling Company of Henderson, Inc.; The Coca–Cola Bottling Company of Johnson City, Tennessee; and Wilmington Coca–Cola Bottling Works, Inc., Defendants.**

No. C–C–86–363–M.

United States District Court,
W.D. North Carolina,
Charlotte Division.

May 6, 1988.

Order Certifying Questions for Immediate Appeal July 27, 1988.

As Amended July 27, 1988.

See also, 720 F.Supp. 1196.

William L. Rikard, Jr., I. Faison Hicks, Parker, Poe, Thompson, Bernstein, Gage & Preston, Charlotte, N.C., Peter Aron, Alan T. Gallanty, Nancy Prahofer, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for plaintiff.

Ned A. Stiles, Golding, Crews, Meekins & Gordon, Charlotte, N.C., William M. Dreyer, The Coca-Cola Co., Legal Div., Atlanta, Ga., for defendant Coca-Cola Co.

E. Osborne Ayscue, Jr., Norvin K. Dickerson, III, Smith, Helms, Mulliss & Moore, Charlotte, N.C., for Southeastern Container, Inc.

Jonathan M. Jacobson, Carolyn T. Ellis, David A. Schwartz–Leeper, Coudert Brothers, New York City, for all other defendants.

## ORDER

McMILLAN, District Judge.

### HISTORY OF PROCEEDINGS

Plaintiff Sewell Plastics, Inc., a national manufacturer of plastic soft drink containers, commenced this suit on August 5, 1986, against defendants the Coca–Cola Company ("Coke"), Southeastern Container, Inc. ("Southeastern"), and thirty-three bottling companies ("the bottlers"). Plaintiff claims that defendants have conspired to form and have formed a combination in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; have attempted to monopolize and have monopolized a line of commerce in a distinct geographic market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; have engaged in an exclusive dealing arrangement in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14; have acquired stock with the effect of substantially lessening competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18; and have violated various provisions of the North Carolina Unfair Trade Practices Act, N.C.Gen.Stat. § 75–1 *et seq.*

On September 29, 1987, defendants moved jointly for summary judgment. Defendant Coke moved on November 6, 1987, for summary judgment on separate grounds. Plaintiff filed on December 1, 1987, a motion for summary judgment dismissing defendant Southeastern's counterclaim and a motion to strike defendant Coke's sixth affirmative defense. On January 19, 1988, plaintiff filed a motion for summary judgment of *per se* illegality.

On April 18, 1988, the court heard oral argument on these motions. The court denied from the bench plaintiff's motion for summary judgment dismissing defendant Southeastern's counterclaim and plaintiff's motion to strike defendant Coke's sixth affirmative defense. The court took the other motions under advisement.

For the reasons stated below, the court rules as follows: 1) defendants' joint motion for summary judgment is ALLOWED IN PART; 2) defendant Coke's motion for summary judgment is DENIED; 3) plaintiff's motion for a declaration of per se illegality is DENIED.

*Legal Standard for Summary Judgment*

Summary judgment is proper when there is a demonstrated absence of genuine dispute concerning any material fact, and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. Rule 56. When the defendant is the movant, defendant has the initial burden of showing the court that the record demonstrates an absence of genuine issue of material fact. *Celotex Corporation v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Defendant also has the burden of persuading the trial court that, on the undisputed facts, plaintiff's claims are not legally viable.

Alternatively, the defendant may discharge its burden by showing the trial court that the evidence supporting a necessary element of plaintiff's legal claim is insufficient as a matter of law to justify a rational fact-finder in finding that plaintiff was able to prove that element. *Celotex,*

477 U.S. at 322–3, 106 S.Ct. at 2552; *Matsushita Electric Industrial Co. v. Zenith Radio,* 475 U.S. 574, 586–7, 106 S.Ct. 1348, 1355–6, 89 L.Ed.2d 538 (1986). The burden then shifts to plaintiff to identify evidence raising at least a triable issue of fact as to the element in question. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

All inferences from the evidence are to be drawn in favor of the non-movant. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

*Factual Conclusions for the Purpose of the Pending Motions*

The evidence of record, viewed in the light most favorable to plaintiff, supports the following factual conclusions:

This suit arises out of the formation of Southeastern Container, Inc. in 1982. Southeastern was formed by some of the bottlers to supply themselves and other Coca–Cola bottlers with plastic soft drink bottles. The bottlers own and control Southeastern.

Plaintiff was the largest supplier of plastic soft drink bottles to the bottlers prior to 1982.

The parties have labeled the relevant geographic market for analysis of plaintiff's claims the "Southeast area." This region is comprised of North Carolina, South Carolina, Georgia, Alabama, Tennessee and Virginia.

The bottler defendants are most of the bottlers licensed by Coke to bottle and sell Coca–Cola soft drink products in the southeast area. The bottlers' license agreement with Coke provides that each bottler shall have the exclusive right to bottle and sell Coke products within a specific territory. Thus, on paper, the bottlers do not directly compete for sales to customers located within their exclusive territories. This territorial sales market division is not the subject of any of plaintiff's legal claims.

Prior to the formation of Southeastern in 1982, the bottlers were competitors or potential competitors with one another on the buying side of their business, in obtaining a supply of plastic bottles at the lowest cost, of the highest quality, and on the best terms from one or more suppliers such as plaintiff. In 1981, plaintiff supplied over 90% of the bottlers' aggregate requirements for plastic bottles.

Some of the bottler defendants had engaged in a joint venture known as South Atlantic Canners, Inc. ("SAC") prior to 1982. SAC was a corporation which filled with soft drink products cans the bottlers purchased from merchant can suppliers. Based on information supplied by Coke, the bottlers who formed SAC and other bottlers considered the possibility of investing in a company to manufacture plastic bottles to supply their requirements, and formed Southeastern.

Southeastern is wholly owned by the bottlers to whom it supplies plastic bottles. Employees of the bottlers and of Southeastern serve as Southeastern's board of directors.

In 1981, representatives of certain of the bottler defendants met with representatives of plaintiff. The bottlers' representatives told plaintiff's representatives that the bottlers would join together to manufacture their own bottles if plaintiff was unable to supply 2-lit bottles for $200 per thousand. This price was lower than any other price then being offered in the Southeast area.

Before Southeastern was capable of making and delivering bottles, the bottlers entered into supply contracts with Southeastern. Under these contracts, the bottlers agreed to purchase 80% of their annual requirements for a five year period. The bottlers were obligated to accept Southeastern's set price for the first year of the contract. After the first year, the contracts provided that the bottlers could purchase in excess of 20% of their requirements from another source only if they proved that two other suppliers offered lower prices over a six month period, and that Southeastern was unable to meet within sixty days an average of the two lowest prices.

Long-term supply contracts for such a significant portion of a bottler's requirements were common in the plastic bottle

supply market prior to the formation of Southeastern. However, the Southeastern price clause was more restrictive than plaintiff's. Plaintiff's contracts, by contrast, required plaintiff to meet a lower price or to allow the bottler to purchase elsewhere.

The bottlers also agreed that Southeastern would charge all the owner-bottlers the same price, and that transportation costs to bottlers located at different distances from Southeastern's plant would be "equalized" so that no owner-bottler would enjoy a lower transportation cost by reason of its geographic proximity to Southeastern.

Coke's involvement in the formation and success of Southeastern was substantial. Coke's manager of vertical integration presented financial projections and plans for a plastic bottle self-manufacturing venture to a meeting of bottlers, immediately after which the bottlers voted to pursue a self-manufacturing strategy. Coke agreed to guarantee debts generated by the formation of Southeastern, although such a guarantee was never executed. When bottlers hesitated to enter supply contracts with Southeastern they were called before a Southeastern Board meeting held at Coke headquarters. Coke's manager of vertical integration targeted specific bottlers who were unwilling to embrace the self-manufacture concept for persuasion and approached them for that purpose. Two of the bottlers approached by Coke subsequently entered contracts with Southeastern. When Southeastern was unable to produce bottles that met Coke's specifications for packaging of Coke's licensed products, Coke temporarily relaxed the specifications, enabling bottlers to honor their supply contracts with Southeastern.

### DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

*Plaintiff's Claim Under Section 1 of the Sherman Act*

Section 1 of the Sherman Act prohibits concerted activity which results in an unreasonable restraint of trade. *North-*west Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 289, 105 S.Ct. 2613, 2616, 86 L.Ed.2d 202 (1985). A restraint is unreasonable when its purpose and effect are to injure competition. *United States v. Socony–Vaccuum Oil Company,* 310 U.S. 150, 223–4, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940); *See also, Board of Trade of the City of Chicago v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 243–244, 62 L.Ed. 683 (1918).

Courts have developed a two-tier system of analyzing restraints under Section 1. Certain categories of business behavior have been labeled *per se* unlawful because "their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northwest Stationers,* 472 U.S. at 289, 105 S.Ct. at 2616, quoting *Northern Pacific R. Co. v. U.S.,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such *per se* rules permit courts to "avoid the significant costs in business certainty and litigation efficiency that a full-fledged ... inquiry entails." *Northwest Stationers,* 472 U.S. at 289, 105 S.Ct. at 2616.

The Supreme Court has applied the *per se* prohibition to four types of conduct: 1) price-fixing, 2) certain concerted refusals to deal, 3) horizontal market division, and 4) tying arrangements. *Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.,* 710 F.2d 752, 772 (11th Cir. 1983); *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.,* 710 F.2d 1366, 1370 (9th Cir.1983).

Under a *per se* analysis, the plaintiff need not show specific anti-competitive effects in a relevant product and geographic market because such anti-competitive effects are presumed to flow from a *per se* unlawful restraint. *Construction Aggregate,* 710 F.2d at 771. "The decision whether to apply the *per se* rule turns on 'whether the practice *facially appears* to be one that would *always or almost always* tend to restrict competition and de-

crease output ... [and not] ... one designed to increase economic efficiency and render markets more, rather than less, competitive.'" *Northwest Stationers*, 472 U.S. at 289–90, 105 S.Ct. at 2616–17, quoting *Broadcast Music, Inc. v. Columbia Broadcasting System*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979) (Emphasis added).

Plaintiff alleges that defendants' conduct constitutes both an unlawful concerted refusal to deal, or "group boycott," and unlawful price fixing. Defendants challenge the applicability of these theories on motion for summary judgment. The applicability of each of these theories to defendants' conduct is examined separately below.

*The Group Boycott Claim*

█ In *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, the Supreme Court recently held that exclusion by a wholesale purchasing cooperative of one of its member-retailers for violation of a cooperative rule was not an unlawful concerted refusal to deal either under a *per se* or a rule of reason analysis. In his opinion for a unanimous court, Justice Brennan summarized the law on "group boycotts" or *per se* unlawful concerted refusals to deal:

Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by 'either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.' Sullivan, *supra*, at 261–262. See, *e.g.*, *Silver*, *supra* (denial of necessary access to exchange members); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656 [81 S.Ct. 365, 5 L.Ed.2d 358] (1961) (denial of necessary certification of product); *Associated Press v. United States*, 326 U.S. 1 [65 S.Ct. 1416, 89 L.Ed. 2013] (1945) (denial of important sources of news); *Klor's, Inc., supra* (denial of wholesale supplies). In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete, *Silver, supra;*

*Radiant Burners, Inc., supra,* and frequently the boycotting firms possessed a dominant position in the relevant market. *E.g., Silver, supra; Associated Press, supra; Fashion Originators' Guild of America, Inc. v. FTC,* 312 U.S. 457 [61 S.Ct. 703, 85 L.Ed. 949] (1941). See generally Brodley, Joint Ventures and Antitrust Policy, 95 Harv.L.Rev. 1523, 1533, 1563–1565 (1982). In addition, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.

*Northwest Stationers*, 472 U.S. at 294, 105 S.Ct. at 2619.

The conduct challenged here as a "group boycott" is the bottlers' agreement, as a group, to enter into individual supply contracts with Southeastern, under which the bottlers agreed to purchase 80% of their annual requirements of plastic soft drink bottles for five years. The evidence is undisputed that the bottlers did enter these contracts. A rational trier of fact would be fully justified in concluding that the bottlers as a group agreed to do so prior to contract formation, and that Southeastern made efforts to exact compliance with the contracts after they were executed.

It is also undisputed that the bottlers purchased 17% of their aggregate requirements from Sewell during the contract period, and uncontradicted that some bottlers purchased in excess of 20%.

These facts, viewed in the light most favorable to plaintiff, are insufficient as a matter of law to justify application of the *per se* rule under the Supreme Court's decision in *Northwest Stationers*.

The cases cited by the court in *Northwest Stationers* involve *denial of access*, by those refusing to deal, to "a supply, facility or market" necessary to enable the boycotted firm to compete. *Id.* Here, there has been no showing by plaintiff of any such denial. First, plaintiff has had continuing, though limited, access to the

customers allegedly participating in the boycott. Second, there is insufficient evidence in the record from which a rational trier of fact could find that the bottlers' business was *necessary* to enable plaintiff to compete in the southeast area market. There are other plastic bottle customers in that market (*i.e.*, Pepsi bottlers). Plaintiff has pointed to no evidence in the record describing the respective market shares of the soft drink bottlers. Such evidence might allow a fact finder to determine whether the bottlers' 80% requirements contracts denied plaintiff access to "a market."

A rational trier of fact could not find from the evidence of record that defendants have denied plaintiff relationships "necessary to enable plaintiff to compete," in the sense intended by the unanimous *Northwest Stationers* court. The foreclosure from 80% of the bottler defendants' business has not been shown to approach the total denial of plaintiff's private telephone wire access to New York stock exchange members held *per se* illegal in *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); the effectively total market foreclosure of plaintiff's product by the American Gas Association's denial of certification held *per se* unlawful in *Radiant Burners, Inc. v. Peoples Gas & Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); the effective denial of access by a retail department store to a wholesale supply of ten major national manufacturers' products held *per se* unlawful in *Klors, Inc. v. Broadway— Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); or the denial of access to information produced by a major national news service held *per se* unlawful in *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

To regard the exclusion at issue here as *per se* unlawful would also be an expansion of the *per se* rule because the boycott cases involve combinations between independent businesses that compete *for all other purposes*. Even assuming that plaintiff can prove all the forms of competition between the bottlers it has alleged, this case is distinguishable because there is a substantial component of the bottlers' selling business in which the bottlers do not compete.

Plaintiff has pointed to evidence which could support a rational finding of fact that the bottlers do or did compete in the following ways: First, on the buying side, the bottlers competed for a supply of plastic bottles prior to Southeastern's formation. Second, on the selling side, the bottlers "compete" and by selling products to chain stores which distribute the product to stores located outside the bottlers' exclusive territory. Some bottlers compete for the filling business of non-filling bottlers.

The evidence is undisputed that the bottlers do not compete in sales to buying customers located within their exclusive territories, except for the chain stores. Plaintiff has not pointed to any other evidence which shows that the bottlers compete on the buying side obtaining other inputs, such as soft-drink syrup.

The lack of competition between bottlers due to their exclusive geographic sales territories, along with the *presence* of competition between bottlers of *different* brands within the same territories, substantially reduces the antitrust risks of the bottlers' joint venture combination. *See*, Brodley, *Joint Ventures and Antitrust Policy*, 95 Harvard Law Review, 1523, 1561 (1982). A major focus of judicial construction of Section 1 has been to prevent combinations between competing firms which enable the combination to control prices, restrict output, limit market entry by would-be competitor firms, or otherwise reduce consumer choice. *See, Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 348–56, 102 S.Ct. 2466, 2475–79, 73 L.Ed.2d 48 (1982). *See, also, Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d 210 (D.C.Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). The bottlers' ability *as a group* to do any of these things is limited by competition between Coke products and other soft-drink manufacturers' products.

No case cited by plaintiffs in support of their group boycott theory involves a combination between businesses that have sub-

stantial selling operations in exclusive territories. For example, *Klors' Inc. v. Broadway–Hale Stores* involved a combination between unrelated competing manufacturers, their wholesale distributors, and a company operating a department store located next to plaintiff's department store. *Construction Aggregate Transport v. Florida Rock Industries* involved a combination between one of plaintiffs' largest customers and a supplier of that customer which owned a transportation subsidiary directly in competition with plaintiff. *Com–Tel, Inc. v. Dukane Corp.*, 669 F.2d 404 (6th Cir.1982), involved a combination between a distributor competing with plaintiff in the same geographic area, and a supplying manufacturer who refused to deal with plaintiff. *Weiss v. York Hospital*, 745 F.2d 786, (3rd Cir.1985), involved the use by M.D.'s of their control over hospital admissions to exclude osteopaths, whom the court found to be *direct competitors* for patients. *Weiss*, 745 F.2d at 819. *United States v. Columbia Pictures*, 507 F.Supp. 412 (S.D.N.Y.1980) was a combination between motion picture companies that were competitors in production *and* distribution of films.

The lack of total competition between the bottlers in selling their products is also sufficient to remove the group boycott claim from *per se* treatment because that lack of competition makes the adverse effect of the bottlers' combination *non-obvious*. In a series of opinions beginning with *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Supreme Court has "reformed the law of horizontal restraints." *Rothery Storage & Van Co.*, 792 F.2d at 226. Three principles stand out from this line of decisions.

█ The first principle is that courts should take care not to expand indiscriminately the category of restraints classed as group boycotts. *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 458, 106 S.Ct. 2009, 2017, 90 L.Ed.2d 445 (1986). The second principle is that the court should go beyond a literal approach to *per se* analysis, the approach urged by plaintiff here, and analyze wheth-

er a challenged practice is "plainly anticompetitive and very likely without redeeming value." *Broadcast Music*, 441 U.S. at 9, 99 S.Ct. at 1556–57; *See also, Northwest Stationers*, 472 U.S. at 289–90, 105 S.Ct. at 2616–17. The third principle is that "it is only after considerable experience with certain business relationships that courts classify them as *per se* violations." *Broadcast Music*, 441 U.S. at 9, 99 S.Ct. at 1556–57, quoting *United States v. Topco Associates*, 405 U.S. 596, 607–8, 92 S.Ct. 1126, 1133–34, 31 L.Ed.2d 515 (1972); *See also, Indiana Federation of Dentists*, 476 U.S. at 458–9, 106 S.Ct. at 2017–18.

These principles support the entry of summary judgment as to plaintiff's claim that defendants have engaged in a *per se* illegal group boycott. To subject defendants' conduct to *per se* analysis would expand the category of group boycott beyond its former boundaries because no rational trier of fact could find that plaintiff has been denied access to a market necessary to enable plaintiff to compete, and because, unlike the classic group boycott cases, defendants do not compete in a substantial portion of their selling activities.

Nor is the defendants' agreement to enter the supply contracts "plainly anticompetitive and without redeeming value." Defendants have realized undisputed business advantages from the formation of Southeastern, which facilitates their ability to compete with other soft drink manufacturers.

Finally, defendants' conduct presents a situation with which the courts appear to be relatively unfamiliar. Neither party has cited a Section 1 case involving a similar combination between independent businesses that do substantial sales in exclusive territories.

This court holds, therefore, that the evidence is insufficient as a matter of law to support a finding that defendants' conduct was a *per se* unlawful group boycott. The court also holds that defendants' conduct was not *per se* unlawful as a group boycott.

\*　　\*.　　\*　　\*　　\*　　\*

■ Although not *per se* unlawful, a concerted refusal to deal may still be a violation of the Sherman Act under the "Rule of Reason" if its anti-competitive effects outweigh its pro-competitive justifications. *National College Athletic Association v. Board of Regents of University of Oklahoma,* 468 U.S. 85, 113, 104 S.Ct. 2948, 2966–67, 82 L.Ed.2d 70 (1984).

■ Defendants asserted in oral argument on these motions that summary judgment dismissing all of plaintiff's claims is required because plaintiff's evidence is insufficient to raise a reasonable inference that defendants' combination had the effect of 1) raising prices or 2) reducing output.

This argument distorts the legal authority on which defendants themselves rely. The relevant cited passages, and other controlling authorities, do not contrue anti-competitive effects so narrowly.

Plaintiff's evidence is sufficient to raise a genuine question of fact about the effect on competition of the bottlers' agreement to enter the supply contracts.

*The Price–Fixing Claim*

■ A rational fact-finder could conclude the following from the evidence of record:

1. Southeastern charged the bottler-defendants uniform prices for bottles.

2. Southeastern charged bottlers the same price for transportation regardless of the differing distances from Southeastern's plant to the individual bottlers.

3. Southeastern's supply contracts all contained a standard provision requiring the buyer to take its supply at whatever price Southeastern set for the first twelve months of the contract.

4. Southeastern's supply contracts all contained a standard provision requiring Southeastern to lower its price *after* the first twelve months, only if the buyer could prove that other suppliers had offered a lower price over a six month period. Southeastern could fulfill its obligation by meeting an average of the two lowest prices.

5. These price restraints were imposed as a result of agreement between the bottler defendants.

If the above facts were found, they might be sufficient to establish *per se* unlawful price fixing *if* the defendant bottlers were engaged in a purely competitive relationship outside the confines of their combination. However, because this conduct, if shown, took place within the structure of less-than-complete competition outlined above, it would oversimplify the situation to apply a *per se* label to it. *See, Broadcast Music,* 441 U.S. at 9–10, 99 S.Ct. at 1556–57; *See also, Rothery Storage & Van Co.,* 792 F.2d at 226.

Several features of the defendants' enterprise make the anti-competitive effect of these restraints less than obvious. First, the defendants are setting a *price* for inputs to their production *charged by a joint venture which they own.* In this situation, defendants have *no* obvious incentive to raise prices or restrict output, because they would be raising the cost of their own products. That price is subject to competitive pressure from the prices charged by the distributors of other brands of soft drinks.

This feature of defendants' conduct distinguishes the *per se* price-fixing cases on which plaintiff relies. In no case cited by plaintiff did a court hold a price-fixing agreement *per se* illegal where the price-fixing companies were setting a price charged *to them* by a source of supply owned *by them.*

Second, the price restraints could well be found to be plausibly related to the success of the joint venture. The price restraints could plausibly guarantee that each bottler stockholder will receive a comparably-priced supply, and that bottlers located near the plant will not have a comparative advantage due to their proximity. This device had plausible utility for attracting investors in the enterprise, increasing the volume, and lowering Southeastern's marginal cost of production. This in turn could enable Southeastern to lower its prices, enabling the bottlers to compete more ef-

fectively with bottlers of other soft drink brands.

The "price competition" clause plausibly enabled Southeastern to avoid losing demand for its production due to heavy discounting by an established supplier. There is no evidence that the price competition clause enabled Southeastern to maintain prices at a higher than market level. Indeed, one of plaintiff's arguments is that Southeastern's assured volume allowed it to offer prices at an "artificially low" level.

These restraints were not on their face "plainly anticompetitive and without redeeming value." *Broadcast Music*, 441 U.S. at 9, 99 S.Ct. at 1556–57. Because the courts have not addressed similar restraints in a similar joint venture context, these are not business relationships with which the courts have considerable experience. The application of *per se* analysis is therefore unjustified.

Plaintiff's evidence is sufficient to raise issues of material fact as to the anti-competitive effects of these restraints. The application of Rule of Reason analysis at trial is appropriate.

IT IS THEREFORE ORDERED:

1. That defendants' motion for summary judgment, as to plaintiff's claim that the agreement to enter the supply contracts is *per se* unlawful, is ALLOWED;

2. That defendants' motion for summary judgment, as to plaintiff's claim that the agreement to enter the supply contracts is unlawful under the Rule of Reason, is DENIED;

3. That defendants' motion for summary judgment, as to plaintiff's claim that the price restraints are *per se* unlawful, is ALLOWED;

4. That defendants' motion for summary judgment, as to plaintiff's claim that the price restraints are unlawful under the Rule of Reason, is DENIED;

5. That defendants' joint motion for summary judgment, as to all of plaintiff's other claims, is DENIED;

6. That plaintiff's motion for summary judgment of *per se* illegality, docket # 109, is DENIED;

7. That the separate motion of defendant The Coca–Cola Company for summary judgment, docket # 104, is DENIED.

## ORDER CERTIFYING QUESTIONS FOR IMMEDIATE APPEAL

Pursuant to 28 U.S.C. § 1292(b), the court hereby finds that its order entered May 6, 1988, involves controlling questions of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of this litigation. The controlling questions are:

1. Is plaintiff's evidence of an adverse effect on competition legally sufficient to raise a genuine issue of fact as to whether defendants have violated Sections 1 or 2 of the Sherman Act, or Sections 3 or 7 of the Clayton Act, or N.C.G.S. §§ 75–1, 75–1.1, 75–5(b)(1, 2, 3, 7)?

2. To establish a violation of the antitrust laws, in a case in which the "Rule of Reason" applies, must a plaintiff show some actual or probable adverse effect on price or output?

The court hereby certifies the foregoing questions for immediate appeal under 28 U.S.C. § 1292(b) and, if the United States Court of Appeals for the Fourth Circuit grants defendants permission to pursue a discretionary appeal, stays further proceedings in this case pending determination of that appeal.