NORTHWEST WHOLESALE STATIONERS, INC. *v.*
PACIFIC STATIONERY & PRINTING CO.

No. 83–1368.   Argued February 19, 1985—Decided June 11, 1985

BRENNAN, J., delivered the opinion of the Court, in which all other Members joined except MARSHALL and POWELL, JJ., who took no part in the decision of the case.

*David J. Sweeney* argued the cause for petitioner. With him on the briefs were *Douglas R. Grim* and *Mark B. Weintraub.*

*Catherine G. O'Sullivan* argued the cause for the United States as *amicus curiae* urging reversal. With her on the brief were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Wallace, Deputy Assistant Attorney General Rule,* and *Edward T. Hand.*

*Joseph P. Bauer* argued the cause for respondent. With him on the brief was *Robert R. Carney.**

JUSTICE BRENNAN delivered the opinion of the Court.

This case requires that we decide whether a *per se* violation of § 1 of the Sherman Act, 15 U. S. C. § 1, occurs when a cooperative buying agency comprising various retailers expels a member without providing any procedural means for

---

*\*Ira S. Sacks* filed a brief for Indian Head Inc. as *amicus curiae* urging affirmance.

challenging the expulsion.[1]   The case also raises broader
questions as to when *per se* antitrust analysis is appropriately
applied to joint activity that is susceptible of being character-
ized as a concerted refusal to deal.

## I

Because the District Court ruled on cross-motions for sum-
mary judgment after only limited discovery, this case comes
to us on a sparse record.   Certain background facts are un-
disputed.   Petitioner Northwest Wholesale Stationers is a
purchasing cooperative made up of approximately 100 office
supply retailers in the Pacific Northwest States.   The co-
operative acts as the primary wholesaler for the retailers.
Retailers that are not members of the cooperative can pur-
chase wholesale supplies from Northwest at the same price
as members.   At the end of each year, however, Northwest
distributes its profits to members in the form of a percent-
age rebate on purchases.   Members therefore effectively
purchase supplies at a price significantly lower than do
nonmembers.[2]   Northwest also provides certain warehous-
ing facilities.   The cooperative arrangement thus permits
the participating retailers to achieve economies of scale
in purchasing and warehousing that would otherwise be

---

[1] That section reads in relevant part:

"Every contract, combination in the form of trust or otherwise, or con-
spiracy, in restraint of trade or commerce among the several States, or
with foreign nations, is declared to be illegal."

[2] Although this patronage rebate policy is a form of price discrimination,
§ 4 of the Robinson-Patman Act specifically sanctions such activity by
cooperatives:

"Nothing in this Act shall prevent a cooperative association from return-
ing to its members, producers, or consumers the whole, or any part of, the
net earnings or surplus resulting from its trading operations, in proportion
to their purchases or sales from, to, or through the association."   49 Stat.
1528, 15 U. S. C. § 13b.

A relevant state-law provision provides analogous protection.   Ore. Rev.
Stat. § 646.030 (1983).

unavailable to them. In fiscal 1978 Northwest had $5.8 million in sales. App. 73.

Respondent Pacific Stationery & Printing Co. sells office supplies at both the retail and wholesale levels. Its total sales in fiscal 1978 were approximately $7.6 million; the record does not indicate what percentage of revenue is attributable to retail and what percentage is attributable to wholesale. Pacific became a member of Northwest in 1958. In 1974 Northwest amended its bylaws to prohibit members from engaging in both retail and wholesale operations. See *id.*, at 50, 59. A grandfather clause preserved Pacific's membership rights. See *id.*, at 59. In 1977 ownership of a controlling share of the stock of Pacific changed hands, *id.*, at 70, and the new owners did not officially bring this change to the attention of the directors of Northwest. This failure to notify apparently violated another of Northwest's bylaws. See *id.*, at 59 (Bylaws, Art. VIII, § 5).

In 1978 the membership of Northwest voted to expel Pacific. Most factual matters relevant to the expulsion are in dispute. No explanation for the expulsion was advanced at the time, and Pacific was given neither notice, a hearing, nor any other opportunity to challenge the decision. Pacific argues that the expulsion resulted from Pacific's decision to maintain a wholesale operation. See Brief in Opposition 11. Northwest contends that the expulsion resulted from Pacific's failure to notify the cooperative members of the change in stock ownership. See Pet. for Cert. 8. The minutes of the meeting of Northwest's directors do not definitively indicate the motive for the expulsion. App. 75–77. It is undisputed that Pacific received approximately $10,000 in rebates from Northwest in 1978, Pacific's last year of membership. Beyond a possible inference of loss from this fact, however, the record is devoid of allegations indicating the nature and extent of competitive injury the expulsion caused Pacific to suffer.

Pacific brought suit in 1980 in the United States District Court for the District of Oregon alleging a violation of § 1 of the Sherman Act. The gravamen of the action was that Northwest's expulsion of Pacific from the cooperative without procedural protections was a group boycott that limited Pacific's ability to compete and should be considered *per se* violative of § 1. See Complaint ¶ 8, App. 4–5. On cross-motions for summary judgment the District Court rejected application of the *per se* rule and held instead that rule-of-reason analysis should govern the case. Finding no anticompetitive effect on the basis of the record as presented, the court granted summary judgment for Northwest. See App. to Pet. for Cert. 22–24.

The Court of Appeals for the Ninth Circuit reversed, holding "that the uncontroverted facts of this case support a finding of *per se* liability." 715 F. 2d 1393, 1395 (1983). The court reasoned that the cooperative's expulsion of Pacific was an anticompetitive concerted refusal to deal with Pacific on equal footing, which would be a *per se* violation of § 1 in the absence of any specific legislative mandate for self-regulation sanctioning the expulsion. The court noted that § 4 of the Robinson-Patman Act, 15 U. S. C. § 13b, specifically approves the price discrimination occasioned by such expulsion and concluded that § 4 therefore provided a mandate for self-regulation. Such a legislative mandate, according to the court, would ordinarily result in evaluation of the challenged practice under the rule of reason. But, drawing on *Silver* v. *New York Stock Exchange*, 373 U. S. 341, 348–349 (1963), the court decided that rule-of-reason analysis was appropriate only on the condition that the cooperative had provided procedural safeguards sufficient to prevent arbitrary expulsion and to furnish a basis for judicial review. Because Northwest had not provided any procedural safeguards, the court held that the expulsion of Pacific was not shielded by Robinson-Patman immunity and therefore consti-

tuted a *per se* group boycott in violation of § 1 of the Sherman Act. 715 F. 2d, at 1395–1398.

We granted certiorari to examine this application of *Silver* v. *New York Stock Exchange, supra,* in an area of antitrust law that has not been free of confusion.[3] 469 U. S. 814 (1984). We reverse.

## II

The decision of the cooperative members to expel Pacific was certainly a restraint of trade in the sense that every commercial agreement restrains trade. *Chicago Board of Trade* v. *United States,* 246 U. S. 231, 238 (1918). Whether this action violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint. *Ibid.* Rule-of-reason analysis guides the inquiry, see *Standard Oil Co.* v. *United States,* 221 U. S. 1 (1911), unless the challenged action falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5 (1958).

This *per se* approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive. Courts can thereby avoid the "significant costs" in "business certainty and litigation efficiency" that a full-fledged rule-of-reason inquiry entails. *Arizona* v. *Maricopa County Medical Society,* 457 U. S. 332, 343–344 (1982). See also *United States* v. *Topco Associates, Inc.,* 405 U. S. 596, 609–610 (1972). The decision to apply the *per se* rule turns on "whether the practice facially appears to be one that would always or almost always tend to restrict

---

[3] See L. Sullivan, Law of Antitrust 229–230 (1977); Bauer, Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination, 79 Colum. L. Rev. 685 (1979).

competition and decrease output . . . or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1, 19–20 (1979) (citations omitted). See also *National Collegiate Athletic Assn.* v. *Board of Regents of University of Oklahoma*, 468 U. S. 85, 103–104 (1984) (*"Per se* rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct").

This Court has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of §1 of the Sherman Act. See *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207 (1959); *United States* v. *General Motors Corp.*, 384 U. S. 127 (1966); *Radiant Burners, Inc.* v. *Peoples Gas Light & Coke Co.*, 364 U. S. 656 (1961); *Associated Press* v. *United States*, 326 U. S. 1 (1945); *Fashion Originators' Guild of America, Inc.* v. *FTC*, 312 U. S. 457 (1941); *Eastern States Retail Lumber Dealers' Assn.* v. *United States*, 234 U. S. 600 (1914). The question presented in this case is whether Northwest's decision to expel Pacific should fall within this category of activity that is conclusively presumed to be anticompetitive.[4] The Court of Appeals held that the exclusion of Pacific from the cooperative should conclusively be presumed unreasonable on the ground that Northwest provided no procedural protections to Pacific. Even if the lack of procedural protections does not justify a conclusive presumption of predominantly anticompetitive effect, the mere act of expulsion of a competitor from a wholesale cooperative might be argued to be sufficiently likely to have such effects under

---

[4] Northwest raises no challenge before this Court to the conclusion of the Court of Appeals that the cooperative's decision to expel Pacific was a "combination or conspiracy" affecting interstate commerce within the meaning of §1 of the Sherman Act.

the present circumstances and therefore to justify application of the *per se* rule. These possibilities will be analyzed separately.

## A

The Court of Appeals drew from *Silver* v. *New York Stock Exchange*, 373 U. S. 341 (1963), a broad rule that the conduct of a cooperative venture—including a concerted refusal to deal—undertaken pursuant to a legislative mandate for self-regulation is immune from *per se* scrutiny and subject to rule-of-reason analysis only if adequate procedural safeguards accompany self-regulation. We disagree and conclude that the approach of the Court in *Silver* has no proper application to the present controversy.

The Court in *Silver* framed the issue as follows:

> "[W]hether the New York Stock Exchange is to be held liable to a nonmember broker-dealer under the antitrust laws or regarded as impliedly immune therefrom when, pursuant to rules the Exchange has adopted under the Securities Exchange Act of 1934, it orders a number of its members to remove private direct telephone wire connections previously in operation between their offices and those of the nonmember, without giving the nonmember notice, assigning him any reason for the action, or affording him an opportunity to be heard." *Id.*, at 343.

Because the New York Stock Exchange occupied such a dominant position in the securities trading markets that the boycott would devastate the nonmember, the Court concluded that the refusal to deal with the nonmember would amount to a *per se* violation of § 1 unless the Securities Exchange Act provided an immunity. *Id.*, at 347–348. The question for the Court thus was whether effectuation of the policies of the Securities Exchange Act required partial repeal of the Sherman Act insofar as it proscribed this aspect of exchange self-regulation.

Finding exchange self-regulation—including the power to expel members and limit dealings with nonmembers—to be an essential policy of the Securities Exchange Act, the Court held that the Sherman Act should be construed as having been partially repealed to permit the type of exchange activity at issue. But the interpretive maxim disfavoring repeals by implication led the Court to narrow permissible self-policing to situations in which adequate procedural safeguards had been provided.

> "Congress . . . cannot be thought to have sanctioned and protected self-regulative activity when carried out in a fundamentally unfair manner. The point is not that the antitrust laws impose the requirement of notice and a hearing here, but rather that, in acting without according petitioners these safeguards in response to their request, the Exchange has plainly exceeded the scope of its authority under the Securities Exchange Act to engage in self-regulation." *Id.*, at 364 (footnote omitted).

Thus it was the specific need to accommodate the important national policy of promoting effective exchange self-regulation, tempered by the principle that the Sherman Act should be narrowed only to the extent necessary to effectuate that policy, that dictated the result in *Silver*.

Section 4 of the Robinson-Patman Act is not comparable to the self-policing provisions of the Securities Exchange Act. That section is no more than a narrow immunity from the price discrimination prohibitions of the Robinson-Patman Act itself. The Conference Report makes clear that the exception was intended solely to "safeguard producer and consumer cooperatives against any charge of violation of the act *based on their distribution of earnings or surplus among their members on a patronage basis.*" H. R. Conf. Rep. No. 2951, 74th Cong., 2d Sess., 9 (1936) (emphasis added). This section has never been construed as granting cooperatives a blanket exception from the Robinson-Patman Act and cannot plausibly be construed as an exemption to or

repeal of any portion of the Sherman Act.[5]  "There is nothing in the last section of the bill [containing §4] that distinguishes cooperatives, either favorably or unfavorably, from other agencies in the streams of production and trade, so far as concerns their dealings with others."   80 Cong. Rec. 9419 (1936) (remarks of Rep. Utterback).

In light of this circumscribed congressional intent, there can be no argument that §4 of the Robinson-Patman Act should be viewed as a broad mandate for industry self-regulation.   No need exists, therefore, to narrow the Sherman Act in order to accommodate any competing congressional policy requiring discretionary self-policing.   Indeed, Congress would appear to have taken some care to make clear that no constriction of the Sherman Act was intended. In any event, the absence of procedural safeguards can in no sense determine the antitrust analysis.   If the challenged concerted activity of Northwest's members would amount to a *per se* violation of § 1 of the Sherman Act, no amount of procedural protection would save it.   If the challenged action would not amount to a violation of § 1, no lack of procedural protections would convert it into a *per se* violation because the antitrust laws do not themselves impose on joint ventures a requirement of process.

### B

This case therefore turns not on the lack of procedural protections but on whether the decision to expel Pacific is properly viewed as a group boycott or concerted refusal to deal mandating *per se* invalidation.   "Group boycotts" are often listed among the classes of economic activity that merit *per se* invalidation under § 1.   See *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S., at 212; *Northern Pacific R. Co.* v. *United States*, 356 U. S., at 5; *Silver* v. *New York Stock Exchange*, 373 U. S., at 348; *White Motor Co.* v. *United*

---

[5] See, *e. g.*, *American Motor Specialties Co.* v. *FTC*, 278 F. 2d 225, 229 (CA2), cert. denied, 364 U. S. 884 (1960).

*States,* 372 U. S. 253, 259–260 (1963). Exactly what types of activity fall within the forbidden category is, however, far from certain. "[T]here is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine." L. Sullivan, Law of Antitrust 229–230 (1977). Some care is therefore necessary in defining the category of concerted refusals to deal that mandate *per se* condemnation. See *St. Paul Fire & Marine Ins. Co.* v. *Barry,* 438 U. S. 531, 543 (1978) (concerted refusals to deal "are not a unitary phenomenon"). Cf. *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.,* 441 U. S., at 9.

Cases to which this Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by "either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." Sullivan, *supra,* at 261–262. See, *e. g., Silver, supra* (denial of necessary access to exchange members); *Radiant Burners, Inc.* v. *Peoples Gas Light & Coke Co.,* 364 U. S. 656 (1961) (denial of necessary certification of product); *Associated Press* v. *United States,* 326 U. S. 1 (1945) (denial of important sources of news); *Klor's, Inc., supra* (denial of wholesale supplies). In these cases, the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete, *Silver, supra; Radiant Burners, Inc., supra,* and frequently the boycotting firms possessed a dominant position in the relevant market. *E. g., Silver, supra; Associated Press, supra; Fashion Originators' Guild of America, Inc.* v. *FTC,* 312 U. S. 457 (1941). See generally Brodley, Joint Ventures and Antitrust Policy, 95 Harv. L. Rev. 1523, 1533, 1563–1565 (1982). In addition, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.

Although a concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment, not every cooperative activity involving a restraint or exclusion will share with the *per se* forbidden boycotts the likelihood of predominantly anticompetitive consequences. For example, we recognized last Term in *National Collegiate Athletic Assn.* v. *Board of Regents of University of Oklahoma* that *per se* treatment of the NCAA's restrictions on the marketing of televised college football was inappropriate—despite the obvious restraint on output—because the "case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all." 468 U. S., at 101.

Wholesale purchasing cooperatives such as Northwest are not a form of concerted activity characteristically likely to result in predominantly anticompetitive effects. Rather, such cooperative arrangements would seem to be "designed to increase economic efficiency and render markets more, rather than less, competitive." *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc., supra,* at 20. The arrangement permits the participating retailers to achieve economies of scale in both the purchase and warehousing of wholesale supplies, and also ensures ready access to a stock of goods that might otherwise be unavailable on short notice. The cost savings and order-filling guarantees enable smaller retailers to reduce prices and maintain their retail stock so as to compete more effectively with larger retailers.

Pacific, of course, does not object to the existence of the cooperative arrangement, but rather raises an antitrust challenge to Northwest's decision to bar Pacific from continued membership.[6] It is therefore the action of expulsion that

---

[6] Because Pacific has not been wholly excluded from access to Northwest's wholesale operations, there is perhaps some question whether the challenged activity is properly characterized as a concerted refusal to deal. To be precise, Northwest's activity is a concerted refusal to deal with Pacific on substantially equal terms. Such activity might justify *per se*

must be evaluated to determine whether *per se* treatment is appropriate. The act of expulsion from a wholesale cooperative does not necessarily imply anticompetitive animus and thereby raise a probability of anticompetitive effect. See *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc., supra,* at 9. Wholesale purchasing cooperatives must establish and enforce reasonable rules in order to function effectively. Disclosure rules, such as the one on which Northwest relies, may well provide the cooperative with a needed means for monitoring the creditworthiness of its members.[7] Nor would the expulsion characteristically be likely to result in predominantly anticompetitive effects, at least in the type of situation this case presents. Unless the cooperative possesses market power or exclusive access to an element essential to effective competition, the conclusion that expulsion is virtually always likely to have an anticompetitive effect is not warranted. See L. Sullivan, Law of Antitrust 292–293 (1977); Brodley, 95 Harv. L. Rev., at 1563–1565. Cf. *Jefferson Parish Hospital Dist.* v. *Hyde,* 466 U. S. 2, 12–15 (1984) (absent indication of market power, tying arrangement does not warrant *per se* invalidation). See generally *National*

---

invalidation if it placed a competing firm at a severe competitive disadvantage. See generally Brodley, Joint Ventures and Antitrust Policy, 95 Harv. L. Rev. 1521, 1532 (1982) ("Even if the joint venture does deal with outside firms, it may place them at a severe competitive disadvantage by treating them less favorably than it treats the [participants in the joint venture]").

[7] Pacific argues, however, that this justification for expulsion was a pretext because the members of Northwest were fully aware of the change in ownership despite lack of formal notice. According to Pacific, Northwest's motive in the expulsion was to place Pacific at a competitive disadvantage to retaliate for Pacific's decision to engage in an independent wholesale operation. Such a motive might be more troubling. If Northwest's action were not substantially related to the efficiency-enhancing or procompetitive purposes that otherwise justify the cooperative's practices, an inference of anticompetitive animus might be appropriate. But such an argument is appropriately evaluated under the rule-of-reason analysis.

*Collegiate Athletic Assn.* v. *Board of Regents of University of Oklahoma,* 468 U. S., at 104, n. 26 (*"Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct"). Absent such a showing with respect to a cooperative buying arrangement, courts should apply a rule-of-reason analysis. At no time has Pacific made a threshold showing that these structural characteristics are present in this case. See Complaint, App. 2; Motion for Partial Summary Judgment, App. 9.[8]

The District Court appears to have followed the correct path of analysis—recognizing that not all concerted refusals to deal should be accorded *per se* treatment and deciding this one should not.[9] The foregoing discussion suggests, however, that a satisfactory threshold determination whether anticompetitive effects would be likely might require a more detailed factual picture of market structure than the District

---

[8] Given the state of this record it is difficult to understand how the Court of Appeals could have concluded that Pacific "loses the ability to use Northwest's superior warehousing and expedited order-filling facilities, as well as any competitive advantages that may flow simply from being known in the industry as a member of an established cooperative." 715 F. 2d 1393, 1395 (1983). The District Court had specifically found no anticompetitive effect.

[9] The District Court stated:

"I think that in a case of this nature, in order to move an antitrust violation, it is necessary to show some restraint of competition, and I don't believe that is shown here. Even if it is a group boycott, I still believe under [*Joseph E. Seagram & Sons, Inc.* v. *Hawaiian Oke & Liquors, Ltd.,* 416 F. 2d 71 (CA9 1969), and *Ron Tonkin Gran Turismo, Inc.* v. *Fiat Distributors, Inc.,* 637 F. 2d 1376 (CA9 1981)], that the Rule of Reason operates. And I think if you apply the Rule of Reason to the facts that are submitted by the parties here that are not disputed in this case, you come to the conclusion that there is *[sic]* simply been no showing by the Plaintiff in this case of a restraint of competition as distinguished from possible damage to the Plaintiff by being expelled from the association." App. to Pet. for Cert. 23–24.

Court had before it. Nonetheless, in our judgment the District Court's rejection of *per se* analysis in this case was correct. A plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects. The mere allegation of a concerted refusal to deal does not suffice because not all concerted refusals to deal are predominantly anticompetitive. When the plaintiff challenges expulsion from a joint buying cooperative, some showing must be made that the cooperative possesses market power or unique access to a business element necessary for effective competition. Focusing on the argument that the lack of procedural safeguards required *per se* liability, Pacific did not allege any such facts. Because the Court of Appeals applied an erroneous *per se* analysis in this case, the court never evaluated the District Court's rule-of-reason analysis rejecting Pacific's claim. A remand is therefore appropriate for the limited purpose of permitting appellate review of that determination.

## III

"The *per se* rule is a valid and useful tool of antitrust policy and enforcement." *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S., at 8. It does not denigrate the *per se* approach to suggest care in application. In this case, the Court of Appeals failed to exercise the requisite care and applied *per se* analysis inappropriately. The judgment of the Court of Appeals is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL and JUSTICE POWELL took no part in the decision of this case.