Frank HOWARD, d/b/a Protography, Appellant,

v.

**MINNESOTA TIMBERWOLVES BASKETBALL LIMITED PARTNERSHIP, Respondent,**

**Ogden Entertainment, Inc., Respondent.**

**No. C3–01–864.**

Court of Appeals of Minnesota.

Nov. 27, 2001.

---

Harvey H. Eckart, Reinhardt and Anderson, St. Paul, MN, for appellant.

Douglas R. Peterson, Mankato, MN; and David M. Jaffe, Leonard, Street and Deinard, Minneapolis, MN, for respondent Timberwolves.

Eric J. Rucker, Briggs and Morgan, Minneapolis, MN, for respondent Ogden.

Considered and decided by STONEBURNER, Presiding Judge, TOUSSAINT, Judge, and WILLIS, Judge.

## OPINION

STONEBURNER, Judge.

On appeal from a grant of summary judgment, appellant Frank Howard argues that the district court made impermissible findings of fact and erred as a matter of law in concluding that the Timberwolves (team) acted as a single entity to limit Howard's access to the Target Center to photograph team games and did not violate antitrust laws, and erred by granting summary judgment on his claims for tortious interference with prospective business relations and contract. Because we agree that the team acted as a single entity as a matter of law, and that the team was justified in the alleged interference with Howard's contracts to photograph team games, we affirm.

## FACTS

The team is one of twenty-nine members of the National Basketball Association (NBA). The team leases space at the Target Center in Minneapolis for home games. The Minneapolis Community Development Agency owns the Target Center. Ogden Enterprises, Inc. has a contract with the city to manage the Target Center on a day-to-day basis.[1] The team has the exclusive right to determine who receives access to the Target Center for its basketball games and who may take photographs.

Howard, doing business as "Protography," is a free-lance photographer. He photographs professional sporting events and professional athletes. The team issued Howard a season pass when it started playing at the Target Center so that Howard could photograph every home game, and continued to issue a season pass to Howard for the first four years of the team's existence. Howard installed his own strobe lights in the arena with Ogden's permission, and was allowed to leave the lights in place between games.

In the 1993–94 season, Kent Wipf, the team's media director, discontinued issuing season passes to Howard. Howard's clients were required to submit a written request to Wipf seeking single-game credentials. Wipf also implemented the NBA's "four set rule." This rule allows no more than four sets of lights to be used at any one time during a game, to protect the quality of television broadcasts. The team gives priority use of strobe lights to pho-

---

1. According to the deposition of Ogden official, Jack Larson, Ogden's duties at the Target Center with regard to the team's use of the arena include maintenance, electrical work, ushering, security, setup and changeover, janitorial, and other work from general event usage.

tographers for the Minneapolis Star Tribune, the St. Paul Pioneer Press, and the team photographer. Howard does not challenge these priorities.

In April 1994, Howard contracted with SkyBox International to photograph team members for a trading-card series during the 1994–95 season. The same year, the NBA implemented a league-wide policy prohibiting teams from providing credentials to photographers on assignment from trading-card companies not having a contractual relationship with the NBA. SkyBox did not have a contractual relationship with the NBA so Howard was denied credentials and SkyBox repudiated its contract with Howard.

At the beginning of the 1995–96 season, the team contracted with NBA Photos, a subsidiary of the NBA established in 1987, for photography services. NBA Photos installed a set of strobe lights in the arena. NBA Photos has priority use of one of the four sets of strobe lights and this is the priority use that Howard challenges. Revenue from NBA Photos is divided among member teams. NBA Photos has more than 100 experienced photographers, new technologies for photographing games and events, a photographic library with more than three million images and a global distribution network. Because NBA Photos is given priority use to one of the four sets of strobe lights, Howard has been denied credentials on several occasions. He has been issued credentials on eight occasions and denied credentials on six occasions since the team contracted with NBA Photos.

Howard alleges that the team prohibited him from renting his lighting equipment to other photographers and that a trading-card company repudiated an agreement with him to rent his lights and "felt pressured" to rent lights from NBA Photos. Howard asserts that Ogden conspired with the team to create barriers to his ability to photograph Timberwolves games by asking him about insurance on his lights and ultimately asking him to remove his lights between uses. Howard also asserts that Ogden conspired with the team to exclude him from the arena.

Howard sued the team and Ogden alleging: 1) tortious interference with prospective business relations; 2) tortious interference with contract; 3) unreasonable restraint of trade in violation of Minn. Stat. § 325D.51 (2000); 4) establishment, maintenance or use of monopoly power in violation of Minn.Stat. § 325D.52 (2000); and 5) price fixing, allocation of markets and concerted refusal to deal in violation of Minn.Stat. § 325D.53 (2000). The district court granted summary judgment to the team and Ogden, and this appeal followed.

## ISSUES

1. Did the district court apply the appropriate standard for summary judgment?

2. Did the district court make impermissible findings of fact, misapply Minnesota antitrust statutes, and improperly shift summary judgment burdens by concluding that the team acted as a single entity and as such is not subject to the antitrust statutes?

3. Did the district court err in granting summary judgment to respondents on appellant's tortious interference claims?

## ANALYSIS

When appealing from summary judgment, we ask whether there are any genuine issues of material fact and whether the lower courts erred in their application of the law. *See State by Cooper v.*

*French,* 460 N.W.2d 2, 4 (Minn.1990) (citation omitted).

> [w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'

*DLH, Inc. v. Russ,* 566 N.W.2d 60, 69 (Minn.1997) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). "[T]he party resisting summary judgment must do more than rest on mere averments." *Id.* at 71. A genuine issue for trial must be established by substantial evidence. *Id.* at 70.

■ Minnesota antitrust law should be interpreted consistently with federal court interpretations of federal antitrust law unless Minnesota law clearly conflicts. *See State by Humphrey v. Alpine Air Prods., Inc.,* 490 N.W.2d 888, 894 (Minn.App.1992) *review granted* (Minn. Nov. 17 1992) (holding that Minnesota antitrust law is to be interpreted consistently with the federal courts' construction of federal antitrust law)

### 1. Summary judgment standard.

■ Howard argues that the district court failed to apply the correct standard for summary judgment in antitrust cases. The summary judgment framework for antitrust cases is no different than in any other case. *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1230 (3rd Cir.1993). Summary judgment in all cases "is mandatory against a party who fails to establish an essential element" of its claim. *Lloyd v. In Home*

*Health, Inc.,* 523 N.W.2d 2, 3 (Minn.App. 1994).

Howard seems to be arguing that because he has labeled his allegations *per se* violations of Minnesota antitrust law, he has made a prima facie case which is not subject to summary judgment unless the team and Ogden could show a legitimate procompetitive purpose for their acts.[2] Howard asserts that he has produced evidence to show that

> [d]efendants excluded [Howard] from shooting photos; [d]efendants acted with the intention of reducing competition by reducing access to freelance photographers who compete with NBA Photos; competition among photographers has been reduced; and [Howard] was damaged.

Howard argues that this is precisely what the U.S. Supreme Court and the Minnesota Supreme Court require of a plaintiff to survive summary judgment under either a *per se* or a rule of reason analysis. But the district court based summary judgment on Howard's inability to make a prima facie case of antitrust violations because he cannot demonstrate the collusion required to establish his antitrust claims under Minn.Stat. §§ 325D.51 and 325D.53 or that the team was his competitor as required to establish a claim under Minn. Stat. § 325D.52. The district court did not apply an erroneous standard for granting summary judgment in Howard's antitrust claims.

### 2. The team acted as a single entity as a matter of law.

■ A contract, combination, or conspiracy between two or more persons in unrea-

---

2. In *per se* cases, injury to competition is presumed because of the nature of the activity in question. *See N.W. Wholesale Stationers, Inc. v. Pac. Stationary & Printing Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 2617, 86 L.Ed.2d 202 (1985) (holding the *"per se* approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive"). The district court rejected Howard's assertion that he has stated *per se* antitrust violations.

sonable restraint of trade or commerce is unlawful. Minn.Stat. § 325D.51.

Without limiting section 325D.51, the following shall be deemed to restrain trade or commerce unreasonably and are unlawful:

(1) A contract, combination, or conspiracy between two or more persons in competition:

(a) for the purpose or with the effect of affecting, fixing, controlling or maintaining the market price, rate, or fee of any commodity or service;

(b) affecting, fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity or service; or

(c) allocating or dividing customers or markets, functional or geographical, for any commodity or service. * * *

(3) A contract, combination, or conspiracy between two or more persons refusing to deal with another person, except a refusal to deal by associations, trading boards, or exchanges when predicated upon a failure to comply with rules of membership.

Minn.Stat. § 325D.53, subd. 1.

The United States Supreme Court, interpreting Section 1 of the Sherman Act, which is analogous to Minn.Stat. §§ 325D.51 and .53, has drawn a basic distinction between concerted and independent action:

Section 1 of the Sherman Act requires that there be a contract, combination * * * or conspiracy between the manufacturer and other distributors in order to establish a violation. Independent action is not proscribed. A manufacturer of course generally has a right to deal or refuse to deal with whomever it likes, as long as it does so independently.

*Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984) (quotation and citation omitted).

■■■ Howard does.not dispute that the team is a single entity, but disputes that it acted as such in restricting his access to the arena because Ogden "conspired" with the team to restrict his access. A corporation, however, cannot conspire with itself. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 771, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984). We agree with the district court that Ogden, as manager of the arena, was required to carry out the directives of the team with regard to access to the arena and use of strobe lights in the arena, and did not act as an economically independent entity to collude or conspire with the team for purposes of antitrust law.

■■■ Howard argues that the rule that a corporation cannot conspire with itself applies only to acts of a corporation and its subsidiary. We disagree. Federal antitrust cases make it clear that servicing agents only connected with antitrust defendants by mere circumstance are outside the umbrella of antitrust liability. *See Motor Carriers Labor Advisory Council v. Trucking Mgmt., Inc.,* 711 F.Supp. 216, 223–24 (E.D.Pa.1989) (discussing the scope of agent liability for antitrust claims). The district court did not err by concluding that, as a matter of law, Ogden was a representative of the team and was not acting as a separate entity capable of engaging in a conspiracy with the team to violate antitrust laws.[3]

---

**3.** Howard's reliance on *Chicago Prof'l Sport* *Ltd. P'ship v. Nat'l Basketball Ass'n,* 961 F.2d

### 3. The team is not a competitor of Howard and therefore did not violate Minn.Stat. § 325D.52.

 Howard relies on *Weinberg v. Chicago Blackhawk Hockey Team*, 274 Ill. App.3d 637, 210 Ill.Dec. 860, 653 N.E.2d 1322 (1995) to support his claim that the team violated Minn.Stat. § 325D.52.

The establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices is unlawful.

Minn.Stat. § 325D.52.

 Weinberg, the publisher of hockey programs, alleged that the Blackhawks violated antitrust law in Illinois by refusing to grant Weinberg media credentials and press access to the hockey stadium for Blackhawks' practices, press conferences, and post-game interviews. *Weinberg*, 210 Ill.Dec. 860, 653 N.E.2d at 1323–24. The Blackhawks published a competing program guide and did not want to issue credentials for a publication competing against its publication. *Id.* at 1324. The Illinois Court of Appeals reversed the district court's dismissal of Weinberg's claims for failure to state a claim, concluding that Weinberg had stated a case for violation of the statute under the theory of monopoly leveraging and the essential facilities doctrine. *Id.* at 1323–26.

Monopoly leveraging occurs where a party has monopoly power in one market, and uses this power to extract a competitive advantage in a second market * * *.

In order to state a claim for monopoly leveraging * * * a plaintiff must allege (1) that defendant has monopoly power in one market, (2) that defendant used this power to exact a competitive advantage for itself in a second market, (3) that the competitive advantage was not won on competitive merits, but rather stemmed from a coercive use of the monopoly power in the first market, (4) that the defendant acted with the intent to gain the unwarranted advantage in the second market, and (5) the anti-competitive conduct resulted in a lessening of competition.

*Id.* at 1324–25 (citations omitted).

To state a cause of action * * * based on the essential facilities doctrine, a plaintiff must allege (1) control of the essential facility by a monopolist, (2) a competitor's inability to practically or reasonably duplicate the essential facility, (3) the denial of the use of the facility to a competitor, (4) the feasibility of providing the facility and (5) that denial has had an anti-competitive effect.

*Id.* at 1326 (citations omitted).

Howard alleges that the team has a "monopoly" to play basketball in the arena and unlawfully leveraged that lawful monopoly into a monopoly for NBA photos. Howard fails to explain how contracting with one of Howard's competitors, an entity entirely separate from the team, constitutes monopoly leveraging by the team, denies use of a facility to a competitor of the team, or has any anti-competitive ef-

667 (7th Cir.1992) for the proposition that the team, through its contracts, acted with Ogden "like a cartel to restrict the output of photographs" is misplaced. *Chicago Prof'l Sports Ltd.* actually supports the team's argument that it is free to contract with photographers. The court acknowledged that, even though producers complain about efforts of business rivals that reduce their profits, judicial relief from real injuries caused by rivalry would harm consumers. *Id.* at 669. The NBA does not require the team to contract with NBA Photos. The team finds it commercially reasonable to do so.

fect. His reliance on *Weinberg* is misplaced.

Howard relies on a strained reading of *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) to assert that the team is his competitor. We reject his analogy. Kodak restricted access to parts it manufactured in order to coerce buyers of its equipment into having their equipment serviced by Kodak rather than by independent service providers. *Id.* at 456–58, 112 S.Ct. at 2076–78 (discussing Kodak's argument). In the instant case the team entered into a contract to use the services of one of Howard's competitors on terms that are beneficial to the team. Howard has failed to produce evidence that the team is his competitor or that the team's contract with NBA Photos has had any anti-competitive effect on a particular market. The district court did not err by concluding that Howard has not alleged facts to establish a violation of Minn.Stat. § 325D.52 under the essential facilities doctrine.

**4. Tortious interference claim.**

Howard argues that the district court erred in finding that there was no issue of material fact showing that the team and Ogden tortiously interfered with appellant's contracts. For a claim of tortious interference with a contract to survive, plaintiff must show (1) the existence of a contract, (2) that defendant knew of the contract, (3) that defendant intentionally procured a breach of the contract without justification, and (4) that plaintiff suffered injuries as a direct result of the breach. *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895, 900 (Minn.1982). Based on the legal status of Ogden as merely a representative of the team in these actions, the district court correctly dismissed these claims as to Ogden.

Howard argues that the right to exclude anyone from the arena does not protect the team. This is inaccurate.

> There is no wrongful interference with a contract where one asserts in good faith a legally protected interest of his own * * * believ[ing] that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction.

*Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn.1994) (quotation omitted). Since the team was merely asserting its right to exclude, whether to limit the number of strobe lights, protect the space available, or enforce the NBA rule prohibiting credentials to photographers whose trading-card clients did not have a contract with the NBA, the acts of exclusion do not amount to tortious interference with Howard's contracts or potential business relations.

## DECISION

A representative acting as a servicing agent is not a separate entity capable of colluding or conspiring for purposes of the antitrust laws. The team was not Howard's competitor and could not violate Minn.Stat. § 325D.52 by contracting with an actual competitor of Howard. Howard failed to establish essential elements of his antitrust claims and the district court did not apply the wrong standard in granting summary judgment to team and Ogden on those claims. Howard failed to establish tortious interference with prospective business relations or contract. Therefore, we affirm the district court on these issues.

**Affirmed.**