LAY, Circuit Judge,
dissenting.
It would be hard to imagine a more clearly expressed boycott and resulting restraint on trade than in this case, where these actions were, extraordinarily, documented by the Defendants.[17] It would also be hard to imagine a restraint with a more pernicious anticompetitive effect, as it effectively forced Craftsmen to join either the QVM or CMC programs or cease advertising its product. Reflecting on these undisputed facts, the district court applied the per se rule, evidently deciding that the advertising restraint “facially appears to be one that would always or almost always tend to restrict competition.” [18] Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 19-20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). The majority now remands for application of the rule of reason on the basis that the restraint “could be” procompetitive and that safety concerns were “arguably” a motivating factor behind Ford’s actions. I submit that the evidence does not support these “safety concerns” arguments, and respectfully dissent.

The Per Se Rule

The majority-is correct to note that the rule of reason is the prevailing standard for analyzing a restraint’s effect upon competition. However, the per se rule is not entirely obsolete. Both the Supreme Court and other circuit courts continue to identify the per se rule as the accepted method of analysis for restraints that are obviously anticompetitive. See State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) (“Some types of restraints ... have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful per se.”); see also InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 158-59 (3d Cir.2003); Cont’l Airlines, Inc. v. United Airlines, Inc., 277 F.3d 499, 509 (4th Cir.2002); Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1058 (8th Cir.2000).
The instant case appears to meet all of the characteristics of a typical per se case as described in Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985):
*883 Cases to which this Court has applied the per se approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle. In these cases, the boycott often cut[s] off access to a supply, facility, or market necessary to enable the boycotted firm to compete, and frequently the boycotting firms possessed a dominant position in the relevant market. In addition, the practices were generally not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive. Under such circumstances the likelihood of anticom-petitive effects is clear and the possibility of countervailing procompetitive effects is remote.
Id. (citations and quotations omitted). In this case, Ford was irritated by the existence of small coachbuilders who were exploiting the profitable market for extra-long limousines. The existence of these small coachbuilders threatened Ford’s QVM program because it essentially penalized QVM coachbuilders, who were prohibited from building extra-long limousines because of QVM restrictions. Consequently, Ford acted in concert with LIMO to quash this competition by using their combined influence to cut off all national advertising resources to these small coach-builders.[19] In light of this bold and undisguised anticompetitive behavior, I believe this case fits into that category of “agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality-they -are ‘illegal per se.’”[20] Nat’l Soc’y of Profl Eng’rs v. United States, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978).

Safety Concerns

I am not persuaded that Ford’s supposed “safety concerns” remove this case from the purview of the per se rule. The evidence simply does not support that Ford was motivated by safety concerns. The majority stresses that Ford spent “millions of dollars” to develop the QVM program to establish safety standards for the manufacture of limousines. However, Ford’s own internal documents demonstrate that the motivation behind the program was not safety, but to “ensure that Ford would retain its competitive advantage over Cadillac and further improve the image of [the] Lincoln Town Car” and “produce incremental sales and profits to Ford and its dealers.” (J.A. 02213-16.)
*884 The manner in which Ford implemented the program reinforces the idea that Ford was interested in market control and profits, not safety. Coachbuilder Marsha Tor-tora testified that from 1990 to 1997, Ford never once tested any of her limousines to confirm that she was following QVM guidelines or building safe limousines. (Tr. 274.) This would suggest that Ford was not as concerned with the safety of the end-product as it was with enrolling coach-builders into the program to ensure .that the builders were buying and converting its Lincoln Town Cars.
The idea that Ford was concerned with safety is further undermined by the fact that Ford took a very strong stand against allowing a non-QVM coachbuilder, Vinny Bergman, into LIMO, even though he could show compliance with federal safety standards through separate testing. Bergman, owner of Ultra Coach, wanted to join LIMO. (Tr. 290.). Although he stretched Lincoln Town Cars, he did not join the QVM program, presumably because he stretched the cars 180 inches, outside the QVM program parameters. (Tr. 289.) Bergman, however, proved his 180-inch stretches were compliant with federal safety standards, using an independent crash test study, which cost him $250,000. (Tr. 291.) Despite the fact that Bergman had proven compliance with federal safety standards, Ford pressured LIMO members to keep him out of the trade group. (Tr. 290.)
Despite this evidence, the majority insists that Ford’s “safety concerns” take this case outside the scope of the per se rule. The majority relies principally on two cases to support its position. First, it cites Moore v. Boating. Industry Ass’ns, 819 F.2d 693 (7th Cir.1987), for the principle that the promotion of federal safety standards is not something that is likely to be anticompetitive, and therefore application of per se analysis is inappropriate. Id. at 710-11. The critical distinction between this case and Moore, however, is the absence of evidence that Craftsmen’s limousines were unsafe or failed to meet federal safety standards. There was also no suggestion in Moore that “safety concerns” were merely a subterfuge for the desire for greater market control and profits, as is true in the instant case. Indeed, none of the conspirators in the Moore boycott were direct competitors of the plaintiff-manufacturer, whereas here,. both of the Defendants stood to gain from Craftsmen’s demise.'
Second, the majority cites California Dental Ass’n v. FTC, 526 U.S. 756, 119 S.Ct. 1604, 143 L.Ed.2d 935 (1999), stating that “the issue is not whether the restrictions were procompetitive, but whether they could be.” I respectfully submit, however, that California Dental cannot be read to support such a sweeping proposition. The relevant language of the case actually reads, “the plausibility of competing claims about the effects of the professional advertising restrictions rules out the indulgently abbreviated review to which the Commission’s order was treated. The obvious anticompetitive effect that triggers abbreviated analysis has not been shown.” Id. at 778, 119 S.Ct. 1604. It is not sufficient under California Dental to recognize, as the majority does, only that “safety concerns were arguably a motivating factor behind Ford’s actions.” Instead, a court must determine whether it is “plausible” that the procompetitive effects of the restraint outweigh, or at least equal, the anticompetitive effects. I respectfully submit this understanding of the case is compelled by the fact that the Court speaks of the restraint at issue in that case as plausibly having a “net procompetitive effect,” id. at 771, 119 S.Ct. 1604 (emphasis added), and not a “net anticompetitive effect,” id. at 774, 119 S.Ct. 1604 (emphasis *885 added), suggesting that a court is required to weigh the competing effects when deciding which method of analysis to apply.
In other words, application of the rule of reason is not warranted simply because the restraint “could be” procompetitive, based on the Defendants’ “arguable” motivations. If this were the case, the per se rule would hereafter be extinct, as inventive lawyers could always .create a pro-competitive justification for their clients’ monopolistic behavior. Instead, the pro-competitive effects of a restraint must plausibly outweigh, or at least equal, the anticompetitive effects in order to move the case to rule of reason review.
Here, the procompetitive safety rationale is not plausible at all, and I submit the majority’s fixation on these doubtful “safety concerns” is particularly inappropriate in light of the anticompetitive effect of the restriction on competition. Again, there is no evidence that Craftsmen’s limousines were unsafe or failed to meet federal safety standards. Furthermore, as discussed above, the evidence suggests that Ford was not motivated by safety, but was interested only in extinguishing small companies that were taking advantage of the market for extra-long limousines, a market outside the control of Ford’s QVM program. The majority finds significance in the fact that the restriction allowed advertisements of non-QVM coachbuilders who proved compliance with federal safety standards through separate testing, but this fact has little significance. I do not see how placing this burdensome testing requirement on small coachbuilders who already appear to be in compliance with federal safety standards, but who cannot afford to conduct expensive testing, is pro-competitive. Finally, in contrast to these suspect safety claims, the anticompetitive effects of the restriction are overwhelming and undeniable, as it basically eliminated Craftsmen’s ability to nationally advertise and promote its limousines. Accordingly, I would affirm the district court.
From my examination of the record, I fail to understand how any jury, under any method of analysis, could find for the Defendants in this case. The very purpose of the per se rule is to streamline antitrust analysis by making conclusive presumptions about restrictions that are obviously unreasonable. I respectfully submit that by remanding this case to be retried on the basis of this dubious safety rationale, the majority wastes time and judicial resources.
The anticompetitive effects of this restriction are so clear and pernicious, and the procompetitive effects of the restriction are so questionable and attenuated, that I submit the per se rule is the appropriate method of analysis in this case. I also suggest that the majority’s proposed application of the rule of reason to any restraint that arguably “could be” procom-petitive is a misinterpretation of California Dental, and an expansion of the rule of reason analysis.

. The boycott agreement and resulting advertising restriction were documented in: 1) the April 30, 1-996, LIMO minutes that set out the boycott agreement (J.A. 02091-92); 2) the May 6, 1996, letter from LIMO to the magazine that threatened'the boycott (J.A. 02093-94); and 3) the May 9, 1996, fax from the president of LIMO to his fellow members congratulating them on the magazine's change of policy to ban advertisements of non-QVM/CMC coachbuilders (J.A. 02085).

.The district court decided the parties' motions for and against application of the per se rule from the bench at the'close of the Plaintiff's evidence and did not give a rationale for why application of that rule was appropriate. (Tr. 1431-32.)

. I submit that there should be little doubt as to the existence of a horizontal agreement between the Defendants. Ford, a member of LIMO, had obviously involved itself in the manufacturing of limousines. Furthermore, the majority was correct to identify the existence of a conspiracy among the Defendants. I would only add that in addition to the evidence highlighted by the majority, the following evidence also supports that Ford influenced LIMO's agenda and spearheaded the boycott effort: 1) Ford encouraged the formation of LIMO around the time QVM began (Tr. 275); 2) Ford lobbied to keep non-QVM members out of LIMO (Tr. 289-90); 3) Ford voiced its opposition to allowing QVM members to advertise in trade journals that allowed non-QVM members to advertise (Tr. 347); 4) the magazines themselves seemed to be receiving similar pressure directly from Ford (Tr. 332-35); and 5) Ford pressured LIMO coachbuilders to make them keep non-QVM members out of LIMO because "[Ford] felt it was better coming from [LIMO] as an organization.” (Tr. 282.)

. Neither Defendant advocated, or discussed, the application of the "quick look” standard, and it is not appropriate in any event because, in my view, the restraint is obviously anticompetitive.